# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00658-CV

---

### Retirement and Nursing Center - Austin Ltd., Appellant

#### v.

### Israel Joseph, Individually and as Personal Representative of the Estate of Adriana Lopez Joseph, Deceased, Appellee

---

**FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-15-002030, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

Retirement and Nursing Center - Austin Ltd. (Nursing Home) challenges the district court's rulings overruling objections to the adequacy of expert reports in a health-care-liability claim filed by Israel Joseph, Individually and as Personal Representative of the Estate of Adriana Lopez Joseph, Deceased.[1]  *See* Tex. Civ. Prac. & Rem. Code § 74.351(a), (c), (*l*) (addressing expert-reports under Medical Liability Act).  On appeal, the Nursing Home contends that it was entitled to dismissal of Israel's liability claim and attorney's fees because the expert reports from an orthopedic surgeon and a gerontology nurse were deficient and because the nurse was unqualified to render an opinion as to causation.  For the reasons that follow, we will affirm.

---

[1] For clarity, we refer to the decedent, Adriana Lopez Joseph, and her son, Israel Joseph, by their first names.

# BACKGROUND[2]

In June 2011, Adriana was admitted to the Nursing Home. At the time of admission, she suffered from multiple medical problems, including an intracerebral hemorrhage that left her totally dependent on the nursing home staff for all of her activities of daily living, medications, and assistance with transfers and repositioning. Adriana was also at increased risk for fractures because of her osteoporosis. Given her frail condition and immobility, it was necessary for Nursing Home staff to use proper transfer techniques with correct alignment of her body when transferring her and performing daily activities for her, such as bathing and dressing.

On or about July 5, 2013, nurses noted a small bruised area on Adriana's lower right jaw area with yellowish color around it. No other assessment was documented, and no investigation into the cause of her injuries was conducted. The next day, Nursing Home staff noted that Adriana's right knee was swollen. Areas of dark discoloration on her right lower jaw and left upper jaw were also noted. A hospital x-ray showed that Adriana had a displaced spiral fracture to her right femur that was inoperable. On or about July 10, 2013, Adriana was placed in hospice care related to the pain associated with her fracture. She died on July 23, 2013.

Israel Joseph, acting individually and on behalf of his mother's estate, sued the Nursing Home, alleging that it was negligent in:

a. Failing to properly position Ms. Joseph during a transfer;

b. Failing to immediately recognize and report Ms. Joseph's injuries;

c. Transferring Ms. Joseph in such a manner as to cause a fracture to her femur;

---

[2] The facts are summarized from allegations in Joseph's petition and the expert reports from an orthopedic surgeon, Dr. Jeffrey Reuben, M.D.

d. Failing to assign nursing personnel duties consistent with their qualifications based on each resident's written plan of care and the nursing skills needed to provide care to residents, and failing to provide services which meet professional standards of quality, in violation of § 19.802, Texas Dept. of Aging and Disability Services Regulations, and OBRA Code § 483.30;

e. Failing to maintain clinical records on each resident that are complete and accurately documented, in violation of § 19.1910 of the Texas Dept. of Aging and Disability Services Regulations;

f. Fail[ing] to implement and maintain programs of orientation, training and continuing in-service education to develop skills of its staff: as described in § 19.1903 and § 19.1929 of the Texas Dept. of Aging and Disability Services Regulations;

g. Failing to use proper transfer techniques, considering Ms. Joseph's needs and risk for fractures;

h. Fail[ing] to investigate the cause of Ms. Joseph's injuries when it was clear to the Nursing Home staff that she had been injured;

i. Failing to care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's quality of life, in violation of 42 CFR § 483.15;

j. Failing to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness, in violation of 42 CFR § 488.301;

k. Fail[ing] to implement interventions to prevent injuries to Ms. Joseph;

l. Fail[ing] to properly supervise its employees; and

m. Fail[ing] to provide an environment that enhanced Ms. Joseph's quality of life.

When Israel served his petition on the Nursing Home, he also served the Nursing Home with an expert report from a gerontology nurse, Susan Loftin, R.N., Ph.D., and an expert report from an orthopedic surgeon, Dr. Jeffrey Reuben, M.D. The Nursing Home filed an objection and motion to dismiss under the Texas Medical Liability Act (TMLA), contending that both reports were deficient in their discussions of the breach of the applicable standard of care

and the causal link between the Nursing Home's conduct and Adriana's death. *See* Tex. Civ. Prac. & Rem. Code § 74.351(a); *see also id*. §§ 74.001-.507. The district court sustained the Nursing Home's objection to the reports as to the cause of death, overruled all other objections, and granted Israel a thirty-day extension to cure the deficiency. *See id*. § 74.351(c). Specifically, the district court's February 2, 2017 order stated, "Defendant's objection on the cause of death is SUSTAINED. Plaintiff is GRANTED 30 days from the date of this order to cure this deficiency. All other objections are OVERRULED."

Israel timely filed a supplemental report from Dr. Reuben that further discussed the causation issue. Israel did not file a supplemental report from Nurse Loftin. The Nursing Home filed an objection to Dr. Reuben's supplemental report and again sought dismissal of Israel's health-care-liability claim. Specifically, the Nursing Home argued that the supplemental expert report did not establish a causal connection between the Nursing Home's conduct and Adriana's death "that is accurately based on the facts."

After a hearing, the district court signed its September 19, 2018 order overruling the Nursing Home's objection to Dr. Reuben's supplemental report. This interlocutory appeal followed. *See id*. § 51.014(a)(9).

## DISCUSSION

### Scope of review

The parties dispute whether the scope of our review encompasses both of the district court's orders and consideration of all the objections to the experts' reports. The dispute centers on the effect of a statute prohibiting an interlocutory appeal "from an order granting an extension under section 74.351." *See id*. § 51.014(a)(9). Under this statute, when an expert

report is timely served, "the trial court's denial of a motion to dismiss, asserting the report's inadequacy, cannot be appealed if the court also grants a thirty-day extension to cure deficiencies." *Scoresby v. Santillan*, 346 S.W.3d 546, 555 (Tex. 2011); *see Ogletree v. Matthews*, 262 S.W.3d 316, 321 (Tex. 2007) (concluding that when expert report has been served, trial court's actions of denying motion to dismiss and granting extension are inseparable); *see also Badiga v. Lopez*, 274 S.W.3d 681, 686 (Tex. 2009) (Brister, J., dissenting) ("[W]e held in *Ogletree* that a defendant cannot appeal when the trial court grants an extension, but must instead wait 30 days and then appeal if the amended report is inadequate."). After an extension has been granted, if the defendant again moves to dismiss, the trial court's denial of the motion is appealable. *Santillan*, 346 S.W.3d at 555.

Here, the district court's February 2, 2017 order granted Israel an extension of time to cure the reports' deficiency "on the cause of death," and Dr. Reuben's report was supplemented. The February 2, 2017 order finding Dr. Reuben's initial report and Nurse Loftin's report deficient as to causation was not immediately appealable because the district court also granted the thirty-day extension of time to cure the deficiency in those reports. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(9). After Dr. Reuben supplemented his report and the Nursing Home objected to it, the district court issued its September 19, 2018 order overruling the objection and implicitly finding that the supplemental expert was adequate.

Israel was afforded the thirty-day opportunity to cure the reports' deficiency, the Nursing Home filed its objection to Dr. Reuben's supplemental report seeking dismissal, and the Nursing Home has appealed the district court's order overruling the Nursing Home's objection; thus, we may now consider the district court's rulings as to the adequacy of Dr. Reuben's initial and supplemental report and the report from Nurse Loftin that were previously unappealable

5

during the thirty-day window for the opportunity to cure. *See Santillan*, 346 S.W.3d at 555. Accordingly, the scope of our review encompasses both of the district court's orders.

Further, because the district court could look to Dr. Reuben's initial and supplemental reports in determining whether Israel served a report that was statutorily adequate, we may consider both sets of the Nursing Home's objections to those reports. *See Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 513 (Tex. 2017) ("A trial court may read several reports in concert in determining whether a plaintiff has made a good-faith effort to comply with the Act's requirements."); *see also Clavijo v. Fomby*, No. 01-17-00120-CV, 2018 Tex. App. LEXIS 4348, at *20 n.9 (Tex. App.—Houston [1st Dist.] June 14, 2018, pet. denied) (mem. op.) (noting that when expert report has been "supplemented," as opposed to "amended," courts have considered both initial and supplemental reports in determining whether claimant served one that was adequate).

**Objection to adequacy of expert reports**

When an expert report is served, "[e]ach defendant physician or health care provider whose conduct is implicated . . . must file and serve any objection to the sufficiency of the report not later than the 21st day after the date it was served, failing which all objections are waived." Tex. Civ. Prac. & Rem. Code § 74.351(a); *Ogletree*, 262 S.W.3d at 319 (concluding that hospital waived all objections to adequacy of expert report by failing to timely object to it). Here, the only timely objection that the Nursing Home filed and served as to Dr. Reuben challenged the causation element of his expert reports. As to Nurse Loftin, the Nursing Home contended that her report "did not articulate a standard of care or say how it was breached" and that she was unqualified to "express an opinion as to causation." *See* Tex. Civ. Prac. & Rem. Code § 74.351(a).

6

We review a trial court's ruling on the adequacy of an expert report under the TMLA for an abuse of discretion. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018); *American Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 877 (Tex. 2001). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner or acts without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985); *see Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011) (plurality op.). We consider only the information contained in the four corners of the report in analyzing the report's adequacy. *Abshire*, 563 S.W.3d at 223.

A valid expert report has three elements: (1) it must fairly summarize the applicable standard of care; (2) it must explain how a physician or health care provider failed to meet that standard; and (3) it must establish the causal relationship between the failure and the harm alleged. *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013); *see* Tex. Civ. Prac. & Rem. Code § 74.351(r)(6). "A report that satisfies these requirements entitles the claimant to proceed with a suit against the physician or health care provider." *Potts*, 392 S.W.3d at 630. A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court that the report does not represent an objective good-faith effort to comply with the statutory requirements of an expert report. Tex. Civ. Prac. & Rem. Code § 74.351(*l*); *Abshire*, 563 S.W.3d at 223. An expert's report demonstrates a good faith effort when it: (1) informs the defendant of the specific conduct called into question; and (2) provides a basis for the trial court to conclude that the claims have merit. *Abshire*, 563 S.W.3d at 223.

The trial court's job at this stage is not to weigh the report's credibility. *Id*. at 226. The ultimate evidentiary value of the expert's opinions is a matter to be determined at summary judgment and beyond. *Id*.; *Jackson v. Kindred Hosps., Ltd. P'ship*, 565 S.W.3d 75, 81

(Tex. App.—Fort Worth 2018, pet. denied) (concluding that "in an HCLC [health-care-liability claim] expert-report challenge, a trial court's job is to be a gatekeeper—not to determine the truth or falsity of an expert's opinion"); *see Texas San Marcos Treatment Ctr. v. Payton*, No. 03-14-00726, 2015 Tex. App. LEXIS 11818, at \*10 (Tex. App.—Austin Nov. 18, 2015, no pet.) (mem. op.) (noting that correctness of expert's opinions is subject of summary-judgment proceeding or trial, not basis for seeking dismissal under Chapter 74).

**Dr. Reuben's initial and supplemental expert reports**

The Nursing Home contends that it was entitled to dismissal of this health-care-liability claim and attorney's fees because Dr. Reuben's initial report was conclusory and did not establish a causal connection between the Nursing Home's conduct and Adriana's death. As to his supplemental report, the Nursing Home contends that no causal connection was established "that is accurately based on the facts."

The causation element of a health-care-liability-claim report requires the expert to explain "how and why" the alleged negligence caused the injury in question. *Abshire*, 563 S.W.3d at 224. A conclusory statement of causation is inadequate; instead, the expert must explain the basis of his statements and link conclusions to specific facts. *Id*. To meet this "how and why" requirement, the expert need not prove the entire case or account for every known fact; rather, the report is sufficient if it makes a good-faith effort to explain, factually, how proximate cause will be proven. *Id*. An expert report need not prove the defendant's liability but only provide notice of the conduct forming the basis of the claimant's complaints. *Gracy Woods I Nursing Home v. Mahan*, 520 S.W.3d 171, 189 (Tex. App.—Austin 2017, no pet.).

## 1. Initial report

Here, Israel alleged in his petition that the Nursing Home's acts and omissions led to Adriana's fall and proximately caused her death. In support of this claim, Dr. Reuben's initial report stated:

> Ms. Joseph was a frail, debilitated, immobile nursing home resident with a contracture to her right knee. She was totally dependent on the staff for transfers. From my review of the x-rays, Ms. Joseph also had osteoporosis, which put her at increased risk for fractures. This not an unexpected finding given her age and the fact that she had been bed-ridden for several years. For these reasons, it was important that the nursing home staff [ ] exercise caution and use proper transfer techniques when transferring Ms. Joseph and performing activities of daily living, such as bathing and dressing her. The *standard of care* required the nursing home staff maintain proper alignment of Ms. Joseph's body and to not twist or torque her extremities in any way while moving her. This may require the use of more than one staff member to perform properly.
>
> Because Ms. Joseph's injury was a spiral fracture, it was necessarily caused by a twisting or torsional stress to her leg. It should not have happened during the normal course of providing care to her had due care been exercised. Therefore, it is my opinion that based on reasonable medical probability, a twisting of Ms. Joseph's leg during a transfer caused the fracture to Ms. Joseph's femur that was diagnosed on July 6, 2013.
>
> Due to Ms. Joseph's immobile status, she could not have caused this type of injury to herself.
>
> It was a *violation of the standard of care* to transfer Ms. Joseph in such a manner that allowed her femur to fracture. It is my opinion that this failure by the staff of the nursing home resulted in the fracture of Ms. Joseph's right femur. It is also a violation of the standard of care for the nursing staff to not immediately realize that they had fractured her femur. Additionally, Ms. Joseph suffered a great deal of pain and suffering as a direct result of the fracture as is documented in her hospital and hospice notes.
>
> Unfortunately, due to Ms. Joseph's medical status, surgery was not indicated and the family elected for hospice care to provide as much comfort as possible to her until she died on July 23, 2013. There is nothing in the records that would indicate that Ms. Joseph was imminently terminal prior to the fracture. In fact the records I have available to me reflect that she had been in a stable condition prior to the fracture. Therefore, my opinion is that her transfer to hospice was directly

9

related to the fracture and while her death was not solely due to the fracture, the fracture was a significant contributing factor leading to her death.

(Emphases added.)   As to this initial report, the Nursing Home raised causation objections specifically asserting that: (1) Dr. Reuben rendered a "speculative opinion" that Adriana's spiral fracture was more probably caused by the Nursing Home's mishandling of her because she was immobile and could not have caused it herself; (2) there was no basis for Dr. Reuben's opinion that Adriana's fracture caused her death; and (3) the report did not link Adriana's death to the medical examiner's finding of Alzheimer's disease and bronchopneumonia.

## 2.  Supplemental report

After the district court sustained the Nursing Home's objection as to the causation element of the wrongful-death claim, Israel served a supplemental report from Dr. Reuben discussing the causation issue in greater detail:

> By way of supplement to my previous report, you have asked me to elaborate on how Ms. Joseph's right femur the fracture caused her death.
>
> As I stated previously, Ms. Joseph suffered a fracture to her right femur that was discovered on or about July 6, 2013.  Due to her underlying condition, the surgeon on staff at the hospital determined that the fracture was inoperable.  I agree that this was an appropriate decision.  Ms. Joseph was placed in hospice care where she died less than a month later on July 23, 2013.  Her immediate cause of death was listed as bronchopneumonia.  It is my opinion that *the fracture was a substantial factor in bringing about her death and without which Ms. Joseph would not have died when she did*.  I base this on the following rationale which is well documented in medical literature.
>
> When a person fractures a large bone, such as the femur, there is a significant negative impact to the patient's overall hemodynamic status.  There are arteries that run through the center of the bone, as well as a network of vessels that run along the outer surface of the bone.  Such a fracture results in a significant amount of bleeding.  If the femur fracture is not operated upon shortly after it is sustained, the blood loss is usually very significant and creates a tremendous strain on the cardiovascular system, which in turn leads to diminished blood supply to the

heart, lungs and other organs. It is interesting to note, in the elderly the mortality rate associated with a femur fracture is over 30% within the first year. Therefore, simply by having a femur fracture, Ms. Joseph's risk of mortality was significantly increased. Because Ms. Joseph lost a large amount of blood because her fracture was not operated upon, she was put at a high risk of failure of her other organs.

Additionally, because Ms. Joseph's fracture was very painful (as is noted in her hospice records), she had to be given routine morphine and Ativan to try to make her more comfortable. It is important to note that Ms. Joseph did not receive these medications prior to the fracture, nor was she in hospice. Both opioids (such as Morphine) and benzodiazepines (like Ativan) are known respiratory depressants. When a person's respiratory system is depressed, they do not take deep breaths and are unable to clear secretions from their lungs. This congestion in the lungs is known as pneumonia, which was Ms. Joseph's cause of death as documented in her autopsy report. Therefore, it is my opinion that Ms. Joseph's femur fracture put a significant overall strain on her system which increased her likelihood of death significantly. Additionally, the use of morphine and Ativan, which was necessary to treat the pain of the fracture, caused her to suffer respiratory depression and pneumonia. Therefore, *the fracture was a significant and proximate cause of her death*.

(Emphases added.) The assertions in this supplemental report explain "how and why" the Nursing Home's alleged negligence caused Adriana's fracture and death. *See Abshire*, 563 S.W.3d at 224.[3] Considered together, the expert reports tie the facts and standards of care laid out by Dr. Reuben and show the connection alleged between the Nursing Home's acts or omissions in violation of that standard and how Adriana's fall and fracture ultimately contributed to her death. *See* Tex. Civ. Prac. & Rem. Code § 74.351(r)(6); *Potts*, 392 S.W.3d at 630; *Payton*,

---

[3] In support of its contentions that the expert reports here are inadequate as to causation, the Nursing Home relies in part on the intermediate appellate court's opinion in *Abshire*, but the Texas Supreme Court reversed that opinion and held that the expert's report was adequate. *See HealthSouth Rehab. Hosp. of Beaumont, LLC v. Abshire*, 561 S.W.3d 193 (Tex. App.—Beaumont 2017), *rev'd sub nom. Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 221, 223 (Tex. 2018) (reversing court of appeals' dismissal of Abshire's claims against Christus after court of appeals ruled that expert's report, even as supplemented, was deficient: "We disagree with the court of appeals' causation analysis and hold that the report sufficiently addresses both causation and the standard of care.").

2015 Tex. App. LEXIS 11818, at *12 (affirming trial court's determination that expert's report was adequate).

The Nursing Home complains that Dr. Reuben does not explain why his conclusion as to Adriana's cause of death "is superior" to that of the medical examiner. According to the Nursing Home, the medical examiner's autopsy—which is not part of this record—"concluded death was from End Stage Alzheimer's Disease and acute bronchopneumonia." However, the trial court's job at this stage of the litigation is not to weigh the expert report's credibility but to assess the adequacy of the report within its four corners, without consideration of information sources extrinsic to the expert's report. *See, e.g.*, *Abshire*, 563 S.W.3d at 223; *Jackson*, 565 S.W.3d at 82, 86 (reversing trial court's order that sustained objection to expert report and dismissed health-care-liability claim because information in four corners of expert's report was sufficient and trial court abused its discretion to extent that it looked beyond report's four corners); *Gonzalez v. Padilla*, 485 S.W.3d 236, 245 (Tex. App.—El Paso 2016, no pet.) (concluding that correctness of expert's opinions is issue for summary judgment, not dismissal under chapter 74, and that trial court may not consider anything outside four corners of expert's report, despite apparent conflicts between expert's assumptions in report and medical records); *see also Payton*, 2015 Tex. App. LEXIS 11818, at *10 (noting that correctness of expert's opinions is subject of summary-judgment proceeding or trial, not basis for seeking dismissal under Chapter 74); *Lotze v. Howton*, No. 01-10-00143-CV, 2011 Tex. App. LEXIS 1972, at *13-14 (Tex. App.—Houston [1st Dist.] Mar. 17, 2011, pet. denied) (mem. op.) (rejecting contention that expert's report was "counterfactual" and "fact free" and that trial court should have considered information extrinsic to four corners of report—i.e., medical records that expert reviewed—in determining sufficiency of expert report).

12

On this record, the Nursing Home has not shown that the district court abused its discretion by determining that Dr. Reuben's supplemental expert report, considered in addition to his initial report, constituted a good-faith effort to inform the Nursing Home of the basis of Israel's health-care-liability claim and allowed the district court to assess the merit of that claim. *See* Tex. Civ. Prac. & Rem. Code § 74.351(*l*), (r)(6); *Abshire*, 563 S.W.3d at 226. Accordingly, we overrule the Nursing Home's appellate issues as to the adequacy of Dr. Reuben's expert reports and its claimed entitlement to attorney's fees for "failure to tender an expert report."[4]

## CONCLUSION

We affirm the district court's orders.

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Triana and Kelly

Affirmed

Filed: August 21, 2019

_____

[4] Because we have concluded that Dr. Reuben's expert report is adequate, we need not address the adequacy of Nurse Loftin's report. *See* Tex. R. App. P. 47.1; *Bakhtari v. Estate of Dumas*, 317 S.W.3d 486, 489 (Tex. App.—Dallas 2010, no pet.) (declining to address health care provider's challenges to report from second expert after court concluded that report from first expert was adequate); *see also Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 Tex. App. LEXIS 8453, at *26 n.2 (Tex. App.—Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.) (same).

13