

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-21-00380-CV

———————————————

JACKSBORO NURSING OPERATIONS, LLC, Appellant

V.

NADINE NORMAN, INDIVIDUALLY; AS THE REPRESENTATIVE OF THE
ESTATE OF ASHLEY NORMAN, DECEASED; AS NEXT FRIEND OF E.N.
AND J.L., MINORS; AND ON BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES, Appellee

---

On Appeal from the 271st District Court
Jack County, Texas
Trial Court No. 19-10-120

---

Before Birdwell, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

## I. INTRODUCTION

This is the second appeal involving this healthcare-liability claim brought by Appellee Nadine Norman, individually; as the representative of the estate of Ashley Norman, deceased; as next friend of E.N. and J.L., minors; and on behalf of all wrongful-death beneficiaries (Plaintiff) against Jacksboro Nursing Operations, LLC d/b/a Faith Community Nursing & Rehabilitation (FCNR). In the prior appeal, FCNR appealed the trial court's denial of its motion to dismiss (FCNR's first motion to dismiss), a motion that was based on FCNR's contention that Plaintiff's expert report did not meet the requirements of the Texas Medical Liability Act (MLA). *See Jacksboro Nursing Operations, LLC v. Norman*, No. 02-20-00262-CV, 2021 WL 1421431, at *1 (Tex. App.—Fort Worth Apr. 15, 2021, no pet.) (mem. op.). While we rejected many of FCNR's arguments in that appeal, we agreed with it in one respect, holding that Plaintiff's expert report "fail[ed] to adequately state what actions FCNR should have taken that would have avoided a breach of the standard of care it owed directly to Ashley." *Id.* We reversed the trial court's order denying FCNR's first motion to dismiss and remanded the case to the trial court to determine whether a thirty-day extension should be granted to correct the deficiency. *Id.* at *16.

Following our remand, the trial court granted Plaintiff an extension to amend the expert report, and Plaintiff served FCNR with an amended expert report. FCNR filed a motion to dismiss (FCNR's second motion to dismiss), arguing that Plaintiff's

2

amended expert report did not meet the requirements of the MLA, and the trial court denied FCNR's second motion to dismiss. In this appeal, FCNR raises four issues—all based on the contention that Plaintiff's amended expert report does not meet the requirements of the MLA. Because we will reject Plaintiff's contentions that the amended expert report does not meet the requirements of the MLA, we will affirm the trial court's order denying FCNR's second motion to dismiss.

## II. BACKGROUND

Plaintiff filed suit against FCNR and two Doe Defendants.[1] Plaintiff's petition alleged that Ashley was admitted into "Defendants' facility" in 2018 and that she "suffered severe personal injuries due to the lack of care provided by Defendants." The petition further alleged that "Defendants' treatment of [Ashley] was continuously tortious and resulted in her tragic and untimely death." As we summarized in our opinion from the first appeal,

> The petition [stated] that the Doe Defendants allegedly raped Ashley while she was a patient at FCNR. Based on this act, Plaintiff's petition alleged causes of action against all the Defendants for sexual assault, false imprisonment, assault and battery, offensive physical contact, intentional infliction of emotional distress, and gross negligence. Against FCNR, the petition alleged causes of action for negligence, negligent hiring, negligent training, negligent supervision, and negligent retention. The petition sought survival damages, which included Ashley's past physical pain and suffering and mental anguish. Plaintiff, on her own behalf and on behalf of the minors for whom she acted as next friend, sought various forms of wrongful-death damages, such as pecuniary loss, loss of consortium, and mental anguish.

---

[1]The Doe Defendants are not parties to this appeal.

3

*Id.* at *1.

In an effort to comply with Section 74.351(a) of the MLA, Plaintiff served FCNR with an expert report made by Dr. David A. Smith (the First Smith Report). *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (requiring a healthcare-liability claimant to serve an expert report within 120 days of filing suit). In our opinion from the first appeal, we summarized the First Smith Report as follows:

> But, in summary, the report claims that Ashley was thirty years of age and suffered from Multiple Sclerosis. At the time she was a patient at FCNR, she provided a urine sample that tested negative for any sexually transmitted disease. A test administered approximately one month after Ashley's admission and after she had been transferred to another facility and then transferred back to FCNR stated that she had contracted trichomonas. Dr. Smith described trichomonas as a sexually transmitted disease. Dr. Smith reported that notations in Ashley's medical records that he reviewed indicated "that the trichomonas was thought to be due to sexual contact that [had] occurred at FCNR."
>
> Dr. Smith's report asserted that both Ashley's medical records that he reviewed and Ashley's statement to her mother (Plaintiff) showed that Ashley had been sexually assaulted while she was a patient at FCNR. The report outlined the standard of care that Dr. Smith opined was due a patient such as Ashley. The report also generally outlined what Dr. Smith viewed as numerous breaches of the standard of care by the Doe Defendants who assaulted Ashley and breaches by FCNR's failure to investigate Ashley's outcries, to keep her safe, and to supervise its employees.

*Jacksboro Nursing*, 2021 WL 1421431, at *2.

FCNR filed objections to the First Smith Report, challenging Dr. Smith's qualifications and contending that the report failed to adequately address causation and injury and was conclusory in its description of how FCNR had breached the

4

standard of care. The trial court overruled FCNR's objections to the First Smith Report. FCNR filed a notice of appeal from that ruling, but "we sent the parties a letter questioning whether an order denying objections made to an expert report but not overruling a motion to dismiss was an appealable interlocutory order." *Id.* FCNR then shifted gears and filed its first motion to dismiss, incorporating the arguments it had made in its objections to the First Smith Report. The trial court denied FCNR's first motion to dismiss, and FCNR appealed that ruling to our court.

On appeal, we rejected FCNR's contentions (1) that Dr. Smith was unqualified to make the First Smith Report; (2) that Plaintiff's claim should be dismissed because the First Smith Report failed to state that there was a causal link between Ashley's injury and her death; and (3) that the First Smith Report failed to support a theory that FCNR was vicariously liable for the actions of its employees. *Id.* at *1. We held, however, that the First Smith Report was "deficient in one regard," stating that "it fail[ed] to adequately state what actions FCNR should have taken that would have avoided a breach of the standard of care it owed directly to Ashley." *Id.* Noting that the remedy for that deficiency was not dismissal of Plaintiff's claim, we reversed the trial court's order denying FCNR's first motion to dismiss and remanded the case to the trial court to determine whether a thirty-day extension should be granted to correct the deficiency. *Id.*

On remand, the trial court entered an order giving Plaintiff additional time to amend the First Smith Report. Plaintiff later served FCNR with an amended expert

5

report by Dr. Smith (the Second Smith Report). We will explore the Second Smith Report in detail later in the opinion when addressing FCNR's issues. But, in summary, the Second Smith Report contains sections on Dr. Smith's qualifications, Dr. Smith's knowledge of the applicable standard of care and legal terms of art, factual information relating to Ashley's medical history and care at FCNR, breaches of the standard of care by FCNR and others, and causation.

After Plaintiff served FCNR with the Second Smith Report, FCNR filed its second motion to dismiss, arguing that the Second Smith Report did not meet the requirements of Section 74.351 of the MLA. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351. FCNR alleged that the Second Smith Report failed to cure the inadequacies of the First Smith Report, that the Second Smith Report did not support Plaintiff's damages theories, that Dr. Smith was not qualified, that the Second Smith Report failed to adequately address causation and injury, and that the Second Smith Report was conclusory and failed to sufficiently describe how FCNR breached the standard of care. Plaintiff responded, and following a hearing, the trial court signed an order denying FCNR's second motion to dismiss. This appeal followed.

### III. DISCUSSION

#### A. Standard of Review

We review a trial court's ruling on a motion to dismiss under Section 74.351 for an abuse of discretion. *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d 75, 80 (Tex. App.—Fort Worth 2018, pet. denied); *see Am. Transitional Care Ctrs. of Tex., Inc. v.*

6

*Palacios*, 46 S.W.3d 873, 877–78 (Tex. 2001). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003); *Jackson*, 565 S.W.3d at 80–81. In reviewing the adequacy of an expert report under Section 74.351, we bear in mind that the Legislature's goal was to deter baseless claims, not to block earnest ones. *Jackson*, 565 S.W.3d at 81; *Gonzalez v. Padilla*, 485 S.W.3d 236, 242 (Tex. App.—El Paso 2016, no pet.).

**B. The Law Applicable to FCNR's Challenge to the Second Smith Report**

In the first appeal, we detailed the law applicable to FCNR's challenge to the First Smith Report. *See Jacksboro Nursing*, 2021 WL 1421431, at *2–4. That law is equally applicable to FCNR's challenge to the Second Smith Report. In our opinion in the prior appeal, we stated,

> "Chapter 74 of the Civil Practice and Remedies Code, also known as the [MLA], requires health care liability claimants to serve an expert report upon each defendant not later than 120 days after that defendant's answer is filed." *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223 (Tex. 2018) (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a)). The report requirement functions "to weed out frivolous malpractice claims in the early stages of litigation, not to dispose of potentially meritorious claims." *Id.*

*Jacksboro Nursing*, 2021 WL 1421431, at *2. We also noted that the MLA requires an expert report to

> provide[ ] a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care[;] the manner in which the care rendered by the . . . health care provider failed to meet the

7

standards[;] and the causal relationship between that failure and the injury, harm, or damages claimed.

*Id.* at *3 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6)).

We explained that "[t]he test applied by the trial court in determining the sufficiency of the report is one of objective good faith." *Id.* (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good[-]faith effort to comply with the definition of an expert report in Subsection (r)(6).")). We also explained that the "Texas Supreme Court has held that a good-faith effort occurs when a report '(1) inform[s] the defendant of the specific conduct called into question and (2) provid[es] a basis for the trial court to conclude the claims have merit.'" *Id.* (quoting *Abshire*, 563 S.W.3d at 223). We further stated,

> Various general principles guide the determination of whether an expert report is sufficient. "A report 'need not marshal all the claimant's proof,' but 'a report that merely states the expert's conclusions about the standard of care, breach, and causation' is insufficient." [*Abshire*, 563 S.W.3d at 223 (quoting *Palacios*, 46 S.W.3d at 877).] Nor does a report have to meet the standards of summary-judgment evidence. *Miller v. JSC Lake Highlands Operations*, 536 S.W.3d 510, 517 (Tex. 2017) ("We remain mindful that an 'adequate' expert report 'does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial.'" (quoting *Scoresby v. Santillan*, 346 S.W.3d 546, 556 n.60 (Tex. 2011))). Also, an expert report need not convince the reader that its conclusions are believable and reasonable. *See Abshire*, 563 S.W.3d at 226 (stating that at the "preliminary [expert-report] stage, whether th[e] standards [referenced in the report] appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort" (quoting *Miller*, 536 S.W.3d at 516–17)).

*Jacksboro Nursing*, 2021 WL 1421431, at *3.

As to the standard of care, we stated that "[t]o adequately identify the standard of care, an expert report must set forth specific information about what the defendant should have done differently." *Id.* at *4 (internal quotations omitted) (quoting *Abshire*, 563 S.W.3d at 226). And we noted that "[w]hile the Act requires only a fair summary of the standard of care and how it was breached, even a fair summary must set out what care was expected[ ] but not given." *Id.* (internal quotations omitted) (quoting *Abshire*, 563 S.W.3d at 226).

As to causation, we stated that "the report must explain how and why the alleged negligence caused the injury in question." *Id.* (internal quotations omitted) (quoting *Abshire*, 563 S.W.3d at 224). We noted that "[c]onclusory descriptions of causation are not adequate" but that "[i]n satisfying th[e] how and why requirement, the expert need not prove the entire case or account for every known fact; the report is sufficient if it makes a good-faith effort to explain, factually, how proximate cause is going to be proven." *Id.* (internal quotations omitted) (quoting *Abshire*, 563 S.W.3d at 224). We recognized that "[t]he sufficiency of the expert report's causation statement should be viewed in the context of the entire report." *Id.* (quoting *Columbia Med. Ctr. of Arlington Subsidiary L.P. v. L.M.*, No. 02-17-00147-CV, 2018 WL 1095746, at *7 (Tex. App.—Fort Worth Mar. 1, 2018, no pet.) (mem. op.)). Finally, we stated that "the detail needed to establish a causal link generally is proportional to the complexity

9

of the negligent act giving rise to the claim." *Id.* (quoting *Columbia Med. Ctr.*, 2018 WL 1095746, at *7). "In other words, a 'causation opinion is not conclusory simply because it is not complex.'" *Id.* (quoting *Columbia Med. Ctr.*, 2018 WL 1095746, at *7).

## C. FCNR's Complaint That the Second Smith Report Is Deficient Because It Does Not Adequately Address FCNR's Breach of the Standard of Care

In its first issue, FCNR complains that the Second Smith Report is deficient because it does not adequately address FCNR's breach of the standard of care. FCNR argues that the Second Smith Report failed to cure the deficiencies of the First Smith Report because "Dr. Smith, again, failed to identify what specific actions should have been taken by [FCNR] and, more importantly, how such actions would have prevented [Ashley's] alleged injury[.]"

In our opinion in the first appeal, we stated that "an expert report is deficient if it merely states the conclusion that the health care provider failed to protect a patient in violation of the standard of care without some indication of what the provider should have done differently." *Id.* at *11. We held that the First Smith Report "fail[ed] to adequately take this second step," noting that the First Smith Report lacked "a description of what FCNR should have done differently." *Id.* at *11, 14. We stated that while the First Smith Report "reference[d] that FCNR should have provided additional or increased measures, those general statements . . . fail[ed] to state what specific steps should have been taken." *Id.* at *14.

10

Notably, we pointed out that the First Smith Report "does highlight one thing that FCNR should have done differently, which is taking the step of not permitting males to be in Ashley's room." *Id.* We noted, however, that "[t]he problem is that the [First Smith Report] has a paragraph that, though it is a muddle, can be read to suggest that FCNR did take this step." *Id.* The pertinent paragraph in the First Smith Report stated,

> There are also notations that Ashley was reported to have experienced multiple episodes of sexual assault at FCNR by FCNR employees. Importantly, it was also noted in numerous locations that Ashley did not want any males present and [that] she only wanted female RNs and PCTs. It appears that the facility complied with this as there are notations of "females only" within the records.

When we considered that paragraph in our opinion in the first appeal, we stated that "[t]he reader is left to guess whether the 'facility' referred to is FCNR or one of the other facilities referenced in the report as places where Ashley received treatment." *Id.* We further stated, "Certainly, even if FCNR took the step of complying with Ashley's request but delayed doing so after her outcries, leading to additional assaults, there might be an indication of causation, but the report does not say this." *Id.*

The Second Smith Report adds additional insight into which "facility" complied with Ashley's request for "no males" and adds additional language regarding FCNR's breaches of the standard of care. In discussing the factual information relating to Ashley's medical history and care at FCNR, the Second Smith Report states, in pertinent part,

11

From my review of the records provided, it appears that [Ashley] was a 30 year-old female at the time of her admission to FCNR. Ashley suffered from Multiple Sclerosis (MS), with abnormalities of gait and mobility, lack of coordination, cognitive communication deficit, pain, and was admitted to FCNR on August 21, 2018. . . . Upon admission, Ashley received a urinalysis which did not return a positive result for any sexually transmitted disease (STD), including trichomonas.

. . . .

. . . Ashley's condition declined while at FCNR and she was readmitted to UTSW on November 17, 2018. On that date, the records indicate that UTSW was called and informed that trichomonas had been found in Ashley's urine. UTSW confirmed the trichomonas and began treatment.

It is important to note what trichomonas is and how it is contracted. Trichomoniasis is a sexually transmitted disease. The disease is contracted during sex when the *trichomonas vaginalis* parasite passes from the infested person to the uninfested person. There is no other known mechanism to acquire the disease. Trichomoniasis can result in painful urination, itching, burning, redness and soreness of the genitals, and a change in vaginal discharge that can involve a fishy smell. Without proper treatment, the infection can last for months or years. While infested, the trichomoniasis can make it incredibly unpleasant and painful to have sex.

The records also indicate in numerous locations that the trichomonas was thought to be due to sexual contact that occurred at FCNR. The only notations in the medical records regarding the possible source of the trichomonas is that it was contracted while at FCNR. There are also notations that Ashley was reported to have experienced multiple episodes of sexual assault at FCNR by FCNR employees. Importantly, it was also noted in numerous locations in the UTSW record that Ashley did not want any males present and she only wanted female RNs and PCTs (personal care technicians aka nursing assistants). After [Ashley's] request for "no males[,"] FCNR delayed in initiating this new order, which resulted in additional assaults. However, it appears that UTSW eventually complied with this request as there are notations of "females only" within the UTSW records. To be clear, no such

12

documentation of "females only" caregivers is found in FCNR records prior to this admission to UTSW.

Finally, Nadine Norman informed me that Ashley complained that she was raped numerous times by two men that worked at FCNR. Ashley claimed that one would rape her while the other would stand by the door. Nadine also stated that Ashley had informed two FCNR nurses of the assault, but that FCNR did not take any action to prevent additional assaults, and that Ashley continued to be sexually assaulted.

It is also important to note that [Ashley] suffered from MS and numerous cognitive deficiencies which would probably render her mentally incapacitated and unable to consent to sexual contact. . . . In my opinion, Ashley was not able to give consent to have sexual intercourse. The standard of care required FCNR to ensure no person, staff or otherwise, was permitted to have sexual intercourse with Ashley.

In discussing FCNR's "breaches of standard of care," the Second Smith Report

states,

Standard of care for a skilled nursing facility requires that the facility maintain an environment in which the resident is safe from abuse and able to maintain dignity. This standard of care concerns <u>prevention</u> of an initial sexual assault perpetrated on the resident by employees of the facility. To meet this standard of care that is owed directly to the patient, FCNR should have provided additional or increased measures to protect its patients. What FCNR should have done differently is FCNR should have had an adequate policy and procedure concerning appropriate behavior of employees in provision of care to residents. They should have provided appropriate in-service training on resident rights and safety to existing employees and "new hires[."] They should have maintained a system that required sufficient supervision of certified nursing assistants by the on duty nursing staff to recognize prolonged absence from assigned tasks. And, they should have done "background checks" on potential employees meeting industry standards and state regulations. I have reviewed no evidence indicating that any of these requirements of the standard of care for a skilled nursing facility were met. Given that an initial sexual assault did occur, with a reasonable degree of medical probability, it is my opinion that one or more of these required elements to meet the standard of care was deficient. The

13

patient's right to be protected from sexual assault in a vulnerable time of illness was not provided to Ashley. As a physician and not a lawyer, it is my understanding that an employer is responsible for the acts of one's employees.

The following discussion of breaches of the standard of care relates to failure to prevent repeated resident abuse in the manner of sexual assault. It is the standard of care for the skilled nursing facility to have in place a process by which allegations of abuse are received and invariably investigated. Typically, this means that an Abuse Coordinator (usually the facility administrator) receives such complaints, reports them to the Department of Aging and Disability Services (DADS) and performs an investigation. All allegations of abuse are required to be reported to the DADS, regardless of their apparent validity. It is the standard of care for the investigation to be undertaken promptly and in a manner that protects the resident from repeated abuse, or retaliation. To meet the standard of care, when the alleged perpetrator(s) is/are known, it is the standard of care to remove them from patient care duties until the investigation is resolved. When the alleged perpetrator(s) is/are unknown, then this is not possible, but the investigation should focus on identifying the perpetrator(s). Any reasonable methodology would, in my opinion, meet the standard of care. Examples of tactics that FCNR could have done differently to ensure reports to nursing staff were processed in a way that would have prevented additional assaults of Ashley would include obtaining a rape examination as soon as possible, investigating what males were working at the time of the alleged assault, doing an actual or virtual "line-up" of male employees with Ashley, a review of all male employees' background checks and personnel records for suspicious content albeit not meeting the criteria to refrain from hiring or termination, clandestine deployment of camera monitoring of Ashley's room or, alternatively, assignment of a trusted female observer to closely monitor those coming and going from Ashley's room, and assignment of only females to Ashley's care. I did not see evidence in the medical record or other materials reviewed to date that provide evidence that this standard of care was met. Given that repeated sexual assaults did occur, with a reasonable degree of medical probability it is my opinion that one or more of the elements of this standard of care was deficient. The breach of the standard of care by FCNR was the proximate cause of cumulative physical and emotional distress suffered by Ashley as a result of repeated sexual assault. Whether transmission of trichomonas occurred with the initial assault or one of the subsequent

14

assaults is unknown but it is clear that she did suffer trichomonas infestation as a result of sexual assault during her stay at FCNR.

The actions of FCNR appear to establish a pattern of conscious indifference to patient safety involving cover-up and have fallen well below the required standard of care by allowing any additional sexual assaults. After notification of the allegation, FCNR staff with this knowledge became accessories after the fact in my opinion as a physician (not a lawyer).

Having reviewed the Second Smith Report, we conclude that it is sufficient with respect to its discussion of FCNR's breach of the standard of care because it provides specific information about what FCNR should have done differently. *See Abshire*, 563 S.W.3d at 226; *Jacksboro Nursing*, 2021 WL 1421431, at *4. First, the Second Smith Report clears up the ambiguity of the First Smith Report regarding which facility complied with Ashley's request that she not be treated by males. In this regard, the Second Smith Report explains that "there are notations of 'females only' within the UTSW records" but that "no such documentation of 'females only' caregivers is found in the FCNR records prior to this admission to UTSW." As we stated in our opinion in the first appeal, this "highlight[s] one thing that FCNR should have done differently, which is taking the step of not permitting males to be in Ashley's room." *Jacksboro Nursing*, 2021 WL 1421431, at *14.

Moreover, the Second Smith Report contains a list of things that FCNR could have done differently in this case,[2] including

---

[2]In its brief, FCNR argues that because the Second Smith Report does not state whether Ashley's acquisition of trichomonas occurred during the initial assault or

15

obtaining a rape examination as soon as possible, investigating what males were working at the time of the alleged assault, doing an actual or virtual "line-up" of male employees with Ashley, a review of all male employees' background checks and personnel records for suspicious content albeit not meeting the criteria to refrain from hiring or termination, clandestine deployment of camera monitoring of Ashley's room or, alternatively, assignment of a trusted female observer to closely monitor those coming and going from Ashley's room, and assignment of only females to Ashley's care.

According to Dr. Smith, FCNR's failure to do these things breached FCNR's standard of care owed to Ashley.

Because the Second Smith Report provides specific information about what FCNR should have done differently, we cannot say that the trial court abused its discretion by denying FCNR's second motion to dismiss. *See Abshire*, 563 S.W.3d at 226; *Jacksboro Nursing*, 2021 WL 1421431, at *4. We overrule FCNR's first issue.

---

subsequent assaults, the Second Smith Report is insufficient. According to FCNR, if the acquisition had occurred during the initial assault, then any subsequent actions taken by FCNR—such as the assignment of only females to Ashley's care—would not have prevented her injury. But the acquisition of trichomonas was not the only injury reported by Ashley. According to the Second Smith Report, Ashley reported being "raped numerous times" and suffered from "the resulting mental, emotional, and physical trauma of repeated sexual assault."

16

**D. FCNR's Complaint That the Second Smith Report Is Deficient Because It Fails to Support Either a Wrongful-Death or Survival Theory of Recovery**

In its second issue, FCNR complains that the Second Smith Report is deficient because it fails to support either a wrongful-death or survival theory of recovery.[3] As we explained in our opinion in the first appeal, Plaintiff need not file an expert report supporting both her wrongful-death and survival theories of recovery. *Jacksboro Nursing*, 2021 WL 1421431, at *9 ("[I]f Plaintiff filed an adequate report to support the claim of a breach of the standard of Ashley's care and her survival claim, then the report need not go further and support the wrongful-death claim to avoid dismissal."); *see Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 630 (Tex. 2013) ("No provision of the [MLA] requires an expert report to address each alleged liability theory.").

Here, the Second Smith Report supports Plaintiff's survival theory of recovery because it provides information giving FCNR a "fair summary" of Ashley's injuries prior to her death. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). In this

---

[3]The distinction between survival claims and wrongful-death claims is as follows: Survival claims result from Texas Civil Practice and Remedies Code Section 71.021, which provides that a claim for injury to a person's health does not abate on death and may be prosecuted by "heirs, legal representatives, and the estate of the injured person." Tex. Civ. Prac. & Rem. Code Ann. § 71.021(a), (b). A wrongful-death claim is generally covered by the Texas Wrongful Death Act, and "damages recoverable in a wrongful[-]death action are for the exclusive benefit of the defined statutory beneficiaries and are meant to compensate them for their own personal loss." *Cunningham v. Haroona*, 382 S.W.3d 492, 508 (Tex. App.—Fort Worth 2012, pet. denied) (citing Tex. Civ. Prac. & Rem. Code Ann. § 71.002, defining wrongful-death cause of action). "Damages recoverable by the statutory beneficiaries under the Wrongful Death Act include pecuniary losses to the beneficiaries, such as loss of inheritance and non-economic damages to compensate for the losses caused by the destruction of the familial relationship." *Id.*

regard, the Second Smith Report describes Dr. Smith's opinion that Ashley "suffer[ed] trichomonas infestation as a result of sexual assault during her stay at FCNR" and that she "suffered from the pain of the infestation" and "suffered from the resulting mental, emotional, and physical trauma of repeated sexual assault." We reject FCNR's assertion that the Second Smith Report "does not present any meaningful information to support a survival claim." FCNR's analysis of the issue focuses only on Ashley's acquisition of trichomonas but fails to take into account Ashley's other injuries described in the report, namely the repeated sexual assaults and the trauma from those assaults, not to mention that the report specifically describes that Ashley "suffered from the pain of the infestation."

Because the Second Smith Report provides information giving FCNR a "fair summary" of Ashley's injuries prior to her death, we cannot say that the trial court abused its discretion by denying FCNR's second motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6). We overrule FCNR's second issue.

## E. FCNR's Complaint That the Second Smith Report Is Deficient Because It Does Not Adequately Address Causation

In its third issue, FCNR complains that the Second Smith Report is deficient because it does not adequately address causation. FCNR argues that the Second Smith Report "fail[s] to meaningfully discuss medical causation or how any alleged breach in the standard of care proximately caused an injury to [Ashley]." As noted above, the Second Smith Report details things FCNR could have done differently to

18

prevent additional assaults of Ashley, including investigating what males were working at the time of the alleged assaults, doing a "line-up" of male employees with Ashley, monitoring Ashley's room with a camera, assigning a female observer to closely monitor those coming and going from Ashley's room, and assigning only females to Ashley's care. The Second Smith Report goes on to state that the breach of the standard of care by FCNR for failing to do these things "was the proximate cause of cumulative physical and emotional distress suffered by Ashley as a result of repeated sexual assault."

Under a heading labeled "causation," the Second Smith Report goes on to state,

> All of the above breaches of the standard of care are the proximate cause of [Ashley's] damages. Prior to entering FCNR, [Ashley] did not have trichomonas or any other sexually transmitted infection according to her urinalysis and her admission evaluations. Trichomonas is only transferred by sexual contact and therefore it is more likely than not, within a reasonable degree of medical probability, Ashley acquired trichomonas from sexual contact while a patient at FCNR. Given the dates and results of the urinalysis, it is more likely than not, within a reasonable degree of medical probability that Ashley's assault occurred while in the care of FCNR . . . . Had John Doe and Richard Roe not sexually assaulted Ashley, she would not have contracted trichomonas, would not have suffered from the pain of the infestation, and would not have suffered from the resulting mental, emotional, and physical trauma of repeated sexual assault.
>
> Furthermore, had FCNR provided a safe environment and properly supervised the direct care staff, [Ashley] would have never been sexually assaulted. A safe environment obviously requires a setting in which patients are free from sexual assault. The patient's right to be protected from sexual assault in a vulnerable time of illness was not provided to Ashley. Additionally, had FCNR complied with the

19

standard of care requiring it to conduct a proper investigation after the first outcry of sexual assault, it is more than likely that a rape examination would have been timely performed to document the rape and institute post rape counse[l]ing to minimize psychological distress and to assist in identification of perpetrators. No subsequent sexual assault would have occurred. Males would not have been permitted in her room and the rapists would have likely been apprehended by the authorities. However, FCNR failed to take any of the above actions and allowed [Ashley] to be continuously sexually assaulted.

The failure to investigate also permitted John Doe and Richard Roe to remain employed and present at FCNR. FCNR chose to turn a blind eye to the direct care providers who were sexually assaulting Ashley. Had the investigation been performed and the standard of care not been breached, John Doe and Richard Roe would have been terminated and Ashley would not have continued to suffer from the repeated sexual assaults. Other residents would not have remained at risk. She would have been provided timely treatment of trichomonas and post rape counseling.

Having reviewed the Second Smith Report, we conclude that it is sufficient with respect to its discussion of causation because it explains how and why the alleged negligence caused Ashley's injuries. *See Abshire*, 563 S.W.3d at 224; *Jacksboro Nursing*, 2021 WL 1421431, at *4. The Second Smith Report explains that FCNR's failure to take the steps detailed above to prevent subsequent sexual assaults caused Ashley to suffer additional assaults and trauma. We disagree with FCNR's assertion that the Second Smith Report "fails to identify any alleged injury purportedly sustained by [Ashley]" but instead only identifies that Ashley "contracted trichomonas at some unknown point in time." Apart from the trichomonas infestation itself, the Second Smith Report also identifies that Ashley had been repeatedly sexually assaulted and suffered trauma as a result of the assaults. We also disagree with FCNR's assertion

20

that Dr. Smith did not consider the possibility that Ashley acquired the trichomonas through a consensual sexual encounter. In the Second Smith Report, Dr. Smith opines that "Ashley was not able to give consent to have sexual intercourse." *See Hickory Trail Hosp., L.P. v. Loya*, No. 05-16-00453-CV, 2016 WL 7376559, at *3 (Tex. App.—Dallas Dec. 20, 2016, pet. denied) (mem. op.) ("For our review of the adequacy of a medical expert report, we take the allegations in the report as true.") (citing *Marino w. Wilkins*, 393 S.W.3d 318, 320 n.1 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)).

Because the Second Smith Report explains how and why FCNR's alleged negligence caused Ashley's injuries, we cannot say that the trial court abused its discretion by denying FCNR's second motion to dismiss. *See Abshire*, 563 S.W.3d at 224; *Jacksboro Nursing*, 2021 WL 1421431, at *4. We overrule FCNR's third issue.

## F. FCNR's Complaint That the Second Smith Report Is Deficient Because It Is Premised on a Theory That FCNR Is Liable for Phantom Sexual Assaults

In its fourth issue, FCNR argues that the Second Smith report is deficient because "it is premised upon a theory that [FCNR] is liable for a phantom sexual assault purportedly committed by an unidentified assailant not alleged to be in the course and scope of the employee's employment." The crux of FCNR's argument seems to be that because "[s]exual assaults are not within the course and scope of employment," FCNR "cannot be held vicariously liable for sexual assaults allegedly committed by its employees."

21

But, as we explained in our opinion in the first appeal, "when an expert report supports a theory of direct liability for negligence, it is sufficient even though it does not support a theory of vicarious liability." *Jacksboro Nursing*, 2021 WL 1421431, at *10. We went on to state that if Dr. Smith amended his report so that it was "sufficient to establish the direct liability of FCNR, Plaintiff will satisfy her obligation to present a report establishing a health care liability claim" irrespective of whether the amended report also supported a theory of vicarious liability. *Id.*

Here, the Second Smith Report was amended to sufficiently describe the direct liability of FCNR. As detailed above, the Second Smith Report sufficiently described how FCNR breached its duty of care owed to Ashley and how that breach proximately caused Ashley's injuries prior to her death. Thus, we cannot say that the trial court abused its discretion by denying FCNR's second motion to dismiss.[4] *See id.* We overrule FCNR's fourth issue.

## IV. CONCLUSION

Having overruled FCNR's four issues, we affirm the trial court's order denying FCNR's second motion to dismiss.

---

[4]Because we have determined that the Second Smith Report sufficiently describes FCNR's direct liability, we need not consider Plaintiff's alternative argument that FCNR should be held vicariously liable because it ratified the Doe Defendants' actions. *See* Tex. R. App. P. 47.1.

/s/ Dana Womack

Dana Womack
Justice

Delivered:  March 24, 2022