

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---------------------------------------------

No. 02-18-00027-CV

---------------------------------------------

MISTY JACKSON, INDIVIDUALLY AND ON BEHALF OF
THE ESTATE OF ROGER J. YOUNG, DECEASED; AND
ROGER JACKSON, Appellants

v.

KINDRED HOSPITALS LIMITED PARTNERSHIP D/B/A
KINDRED HOSPITAL FORT WORTH, Appellee

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-297189-18

Before Sudderth, C.J.; Gabriel and Pittman, JJ.
Opinion by Chief Justice Sudderth

## OPINION

### I. Introduction

This appeal arises out of an order sustaining Appellee Kindred Hospitals Limited Partnership d/b/a Kindred Hospital Fort Worth's (Kindred) objection to Appellants Misty Jackson's, Individually and on Behalf of the Estate of Roger J. Young, Deceased, and Roger Jackson's section 74.351 expert report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (West 2017). Because we conclude that the trial court abused its discretion by sustaining Kindred's objection, we reverse and remand.

### II. Background

Roger J. Young, Roger Jackson's father and Misty Jackson's father-in-law, was 79 years old when he was admitted to Kindred—a long-term care facility—in January 2015. Young stayed at Kindred for a few months before being transferred to Plaza Hospital for critical care. Young died six days later on April 16, 2015.

The Jacksons assert that while Young was at Kindred, he received insufficient monitoring from Kindred's nursing and medical staff and that Kindred's staff failed to adequately treat and report changes in his medical condition, which caused his death. Specifically, the Jacksons contend that during Young's stay at Kindred, he developed several pressure ulcers and abscesses on his scrotum and lower back[1] that the Jacksons contend caused him to develop sepsis, septic shock, and metabolic encephalopathy.

---

[1]Kindred concedes that "[d]espite the nursing staff's treatment and care, Mr. Young developed pressure ulcers and sepsis during his admission period[.]"

2

The Jacksons filed a healthcare liability claim (HCLC) against Kindred and Dr. Muhammad Naveed Siddiqi—Young's treating physician—and timely served both with separate expert reports from Dr. Manuel Eskildsen. *See id.* §§ 74.001(a)(13), .351(a) (West 2017). Kindred and Dr. Siddiqi filed objections to the expert reports. After granting Kindred's objections and allowing the Jacksons to cure the deficiencies, *see id.* § 74.351(c), the Jacksons served amended expert reports. Kindred again filed objections, and the trial court sustained Kindred's objections and dismissed Kindred from the lawsuit; but the trial court ordered that the Jacksons' lawsuit against Dr. Siddiqi could proceed.

Dr. Siddiqi then filed a motion for leave to designate Kindred as a responsible third party. The Jacksons filed a response and motion to reconsider the order dismissing Kindred. After the trial court denied the Jacksons' motion to reconsider and granted Dr. Siddiqi's motion, the trial court granted the Jacksons' motion to sever and rendered final judgment in favor of Kindred. This appeal followed.

On appeal, the Jacksons raise two issues: First, that the trial court abused its discretion by sustaining Kindred's objection to Dr. Eskildsen's expert report, and second, that the trial court abused its discretion by denying their motion to reconsider.

### III. Applicable Law

#### A. Section 74.351 Expert Reports

A plaintiff asserting an HCLC must serve each defendant physician or healthcare provider with one or more expert reports and a curriculum vitae of each expert whose

3

opinion is offered to substantiate the merits of the HCLC. *See id.* § 74.351(a), (i); *TTHR Ltd. P'ship v. Moreno*, 401 S.W.3d 41, 42 (Tex. 2013). The statute requires that such a report must provide: (1) "a fair summary of the expert's opinions . . . regarding applicable standards of care," (2) a statement identifying "the manner in which the care rendered by the physician or [healthcare] provider failed to meet the standards," and (3) an explanation of "the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *see TTHR Ltd. P'ship*, 401 S.W.3d at 44. The purpose of the report is to "inform the defendant of the specific conduct the plaintiff has called into question," and to "provide a basis for the trial court to conclude that the claims have merit." *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001). Thus, the expert report "need not marshal every bit of the plaintiff's evidence," *Jernigan v. Langley*, 195 S.W.3d 91, 93 (Tex. 2006), but it must "explain, to a reasonable degree, how and why the breach caused the injury based on the facts presented." *Jelinek v. Casas*, 328 S.W.3d 526, 539–40 (Tex. 2010).

When a defendant timely files a motion to dismiss challenging the adequacy of an expert report, the trial court may take one of three actions. If the court concludes that the report is adequate, it may deny the motion. *See, e.g., Hillery v. Kyle*, 371 S.W.3d 482, 489, 492 (Tex. App.—Houston [1st Dist.] 2012, no pet.). If the trial court concludes that the report does not constitute an objective, good-faith effort to comply with the statute, it must grant the motion. *See* Tex. Civ. Prac. & Rem. Code Ann.

4

§ 74.351(*l*); *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 51–52 (Tex. 2002); *see also Jernigan*, 195 S.W.3d at 94. Finally, if the court concludes that the report is an objective, good-faith effort to comply with the statute but is nevertheless deficient in some way, it may grant the plaintiff one 30-day extension to cure the deficiency. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c); *Scoresby v. Santillan*, 346 S.W.3d 546, 557 (Tex. 2011).

A report qualifies as an objective, good-faith effort to comply if it (1) informs the defendant of the specific conduct the plaintiff questions, and (2) provides a basis for the trial court to conclude that the plaintiff's claims have merit. *Loaisiga v. Cerda*, 379 S.W.3d 248, 260 (Tex. 2012). The Supreme Court of Texas has held that a trial court may look only to the "four corners" of the expert report to determine whether it constitutes an objective, good-faith effort to comply. *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878.

## B. Standard of Review

We review a trial court's ruling on a motion to dismiss pursuant to section 74.351 for an abuse of discretion. *Palacios*, 46 S.W.3d at 878; *See Tenet Hosps., Ltd. v. Garcia*, 462 S.W.3d 299, 304 (Tex. App.—El Paso 2015, no pet.) ("The trial court makes the decision whether the report is sufficient. Our role, whether the trial court has approved or rejected the report, is to determine if the trial court abused its discretion."). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Walker v. Gutierrez*, 111 S.W.3d 56, 62 (Tex. 2003). In reviewing the adequacy of an expert report, we bear in mind that "[t]he

Legislature's goal was to deter baseless claims, not to block earnest ones." *Gonzalez v. Padilla*, 485 S.W.3d 236, 242 (Tex. App.—El Paso 2016, no pet.) (quoting *Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 631 (Tex. 2013)).

## IV. Analysis

### A. In Assessing an Expert Report's Sufficiency, Courts May Not Look Beyond the Expert Report's "Four Corners"

We first address the Jacksons' contention that Kindred violates the "four corners rule" by picking and choosing excerpts from Dr. Eskildsen's reports and juxtaposing them in an effort to demonstrate the report addressing Kindred's actions (the Kindred Report) is inadequate. The gravamen of Kindred's response is that the predicate factual statements in Dr. Eskildsen's report addressing Dr. Siddiqi's actions (the Siddiqi Report) as compared to the factual statements in the Kindred Report "seemingly concede[] the [Kindred] nursing staff did, in fact, do what they were supposed to do." Kindred argues that while "[s]tanding alone," the factual statements in the Kindred Report "might be sufficient," "Dr. Eskildsen's own report as to Dr. Siddiqi, as well as underlying facts, indicate otherwise."

But in an HCLC expert-report challenge, a trial court's job is to be a gatekeeper—not to determine the truth or falsity of an expert's opinion. *See Mettauer v. Noble*, 326 S.W.3d 685, 691 (Tex. App.—Houston [1st Dist.] 2010, no pet.). Therefore, even if Kindred were correct that the factual statements in the Kindred Report contradicted or

6

conflicted with the factual statements in the Siddiqi Report,[2] resolving such conflicts would require the trial court to go beyond the four corners of the Kindred Report and compare it against the Siddiqi Report in order to determine the truth or falsity of the Jacksons' *factual statements*, which are not for the trial court to adjudicate in a section 74.351 expert-report determination. *See Gonzalez*, 485 S.W.3d at 245 ("There is nothing in the statute suggesting that we may consider an expert's credibility or the data he used at this stage of the litigation."); *Christus Health Se. Tex. v. Broussard*, 306 S.W.3d 934, 939 (Tex. App.—Beaumont 2010, no pet.) (affirming trial court's order denying medical providers' motion to dismiss following plaintiff's section 74.351 expert report even though the factual statements in report were possibly inconsistent with the statements in the plaintiff's pleading because "the trial court could not look beyond the four corners of the report at this stage to determine whether the facts asserted in the pleading and the report were false"); *Collini v. Pustejovsky*, 280 S.W.3d 456, 462 n.4 (Tex. App.— Fort Worth 2009, no pet.) (declining the invitation to go beyond four corners of expert's

---

[2]We disagree with this assessment in any event. A fair reading of the Kindred Report reveals allegations that Kindred's staff provided *some* notes identifying *some* problems with Young's skin infection that were sufficient to alert Dr. Siddiqi to follow up with his own examination, diagnosis, and treatment plan. Indeed, Dr. Eskildsen relied upon some of Kindred's notes in compiling the Kindred Report. But the Kindred Report also alleges that Kindred's staff was deficient by failing to document the extent and increasing severity of Young's skin infection, failing to properly examine Young, failing to try different treatments when one treatment plan did not lead to improvement, failing to properly monitor Young after noting his skin infection, failing to notify the attending physician of Young's worsening condition and abnormal lab results, and failing to follow up with the attending physician after noting the onset of Young's skin infection.

report and instead "constrain[ing] our review of the report's adequacy at this preliminary stage in the proceedings to the specific information and allegations contained within it"); *Tenet Hosps., Ltd. v. Boada*, 304 S.W.3d 528, 542 (Tex. App.— El Paso 2009, pet. denied) ("Whether an expert's opinions are correct is an issue for summary judgment, not a motion to dismiss under Chapter 74.").

Because the trial court could only look to the four corners of the Kindred Report, it was impermissible for the trial court to compare a separate expert report related to a different healthcare provider to negate the factual assertions in the Kindred Report.[3] *Wright*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. Accordingly, we hold that to the extent the trial court sustained Kindred's objection by looking beyond the four corners of the Kindred Report and acting as a factfinder, the trial court abused its discretion.

---

[3]We recognize that when a plaintiff sues multiple defendants for an HCLC, as in this case, the plaintiff may need to file multiple expert reports, in which case courts may read the reports together for certain purposes. *See Abilene Reg'l Med. Ctr. v. Allen*, 387 S.W.3d 914, 918 (Tex. App.—Eastland 2012, pets. denied) ("[A] plaintiff may serve multiple reports by separate experts regarding different defendants, different claims, and different issues, as long as the reports, read together, provide a fair summary of the standard of care, breach, and causation."). We understand this to mean a trial court may "stack" a plaintiff's expert reports in order to determine if the plaintiff has provided the defendants with fair notice of the allegations of duty, breach, and causation, but not that a trial court may juxtapose factual statements in two separate expert reports in order to make factual determinations. *See Gonzalez*, 485 S.W.3d at 245 ("Appellants' points on apparent conflicts between the medical records and the assumptions [the expert] makes are well-taken. But '[w]hether an expert's opinions are correct is an issue for summary judgment, not a motion to dismiss under Chapter 74.'" (quoting *Tenet Hosps., Ltd.*, 304 S.W.3d at 542)). That is to say, multiple section 74.351 expert reports can be combined to satisfy all of the report requirements as to one healthcare provider. But nothing in the statute or case law authorizes the trial court to pit one report as to one healthcare provider against another report as to a different healthcare provider.

8

**B.      The Expert Report Satisfies the Statutory Requirements**

Having held that the trial court could not act as a factfinder by comparing the two reports, we still must examine the four corners of the Kindred Report to determine if it "include[d] opinions on the three statutory elements—standard of care, breach, and causation." *Walgreen Co. v. Hieger*, 243 S.W.3d 183, 188 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

**1.      Standards of Care and Breaches**

The Kindred Report is not required to provide Kindred with "litigation-ready evidence," *Certified EMS*, 392 S.W.3d at 631, or to "meet the same requirements as the evidence offered in a summary-judgment proceeding," *Palacios*, 46 S.W.3d at 879.  To satisfy the notice requirements for Kindred's standards of care and alleged breaches thereof, the report must only fairly "set out what care was expected, but not given." *Id.* at 880.

Dr. Eskildsen opines in the Kindred Report that Kindred's general standard of care "requires that the medical facility provide that level of care and treatment that a reasonable, prudent, similar facility would provide under the same or similar circumstances based on the known medical needs of the resident at issue." *See Birchfield v. Texarkana Mem'l Hosp.*, 747 S.W.2d 361, 366 (Tex. 1987) (holding the standard of care for a hospital is what an ordinarily prudent hospital would do under the same or similar circumstances).  Dr. Eskildsen then provided nine more specific standards of care regarding Young's skin infection:

- that Kindred assess his skin and any related rashes or breakdown properly. Properly documented skin assessment would allow the staff to assay any improvement in his affected areas of skin;

- that Kindred assess Young's condition and continue to change his treatment on ongoing bases until signs of healing occurred;

- that Kindred clearly document its monitoring, assessing, and treating of Young's infection in the medical record;

- that Kindred evaluate and closely monitor Young's skin for any signs and symptoms of infection and implement interventions to address risks of further infection;

- that Kindred develop plans of care documenting the implemented interventions designed to minimize any infection;

- that the facility properly treat any infections that Young had upon admission or developed during his residency at the facility by following all physician orders and evaluating the outcome of those orders;

- that the facility treat any infection with the appropriate antibiotics as ordered by the physician, monitor the infection to determine if the treatment plan was successfully treating the infection, obtain laboratory testing of the infection to determine the effectiveness of the treatments, and continually monitor Young until all laboratory testing confirmed that the infection was fully treated;

- that the staff monitor Young's vital signs during each shift until all of his infection symptoms had resolved and the antibiotic treatment plan was completed; and

- that the facility perform continuing assessments of Young, including an evaluation by a physician to establish a baseline, clearly document in the medical record a specific diagnosis of the infection, develop and document a treatment and care plan to address the infection, document a list of medications prescribed to treat the infection, develop a plan to reassess the condition with a specific timetable, and document any additional treatment notes or requirements needed to address the specific condition.

The Kindred Report identified two ways that Kindred breached the standard of care and then provided numerous specific examples under each heading. Dr. Eskildsen also broadly stated the two identified breaches:

> Kindred failed to ensure Mr. Young received the necessary medical care and treatment to maintain his skin integrity and failed to ensure that the signs and symptoms of infection and abscess exhibited by Mr. Young were assessed by his physician[; and]
>
> . . . .
>
> . . . Kindred failed to timely and properly treat Mr. Young's infection prior to the infection progressing to him going into septic shock and developing endocarditis.

Under the first alleged breach, Dr. Eskildsen further elaborated that

- Kindred did not write new orders after Young developed an abrasion and drainage on his penis;

- Young had a scrotal excoriation and abscess, which Kindred left uncovered and untreated; and

- Kindred did not order antibiotics to treat Young's urinary tract infection.

Regarding the second alleged breach, Dr. Eskildsen asserted more specifically that

> there continued to be no attempt by Kindred's nurses and clinical staff to address [Young's] scrotal abscess. Kindred's nurses did not make any documentation or any attempts to notify the attending physician that Mr. Young needed skin and scrotal assessment and at the very least, further orders and diagnostic testing to rule out his abscess as the causative factor causing his change of condition and infection.

11

In its appellate brief, Kindred acknowledges that "[s]tanding alone" Dr. Eskildsen's identified breaches of the standards of care "might be sufficient," but that "Dr. Eskildsen's own report [as] to Dr. Siddiqi, as well as underlying facts, indicate otherwise." If indeed the Kindred Report is sufficient "[s]tanding alone," then it is sufficient pursuant to section 74.351.[4] As explained above, it is an abuse of discretion for a trial court or a reviewing court to act as a factfinder and look beyond the four corners of the expert report. *See Gonzalez*, 485 S.W.3d at 244 (rejecting defendant's invitation to look "beyond the four corners of the report and consider extrinsic evidence, or at the very least the actual records [the expert] relied on, to determine if his opinion is worthy of credence").

Kindred also asserts that the Kindred Report does not provide standards of care related to Young's specific injuries because Dr. Eskildsen does not provide a standard of care for wound care "despite his criticisms [that] the staff failed to properly cover the scrotal wound, which Dr. Eskildsen opines led to infection." The Jacksons argue that such a level of specificity is not required by section 74.351.

We agree with Kindred's observation that the standard for wound care recited by Dr. Eskildsen is not extremely detailed. For example, Dr. Eskildsen generally states that Kindred was required to "properly treat" any infections that Young had upon

---

[4]The very premise of Kindred's argument requires that we look beyond the four corners of the Kindred Report itself; thus, on its face Kindred's argument invites us to misapply the applicable standard.

12

admission or that may have developed during his stay at Kindred. Likewise, Dr. Eskildsen alleges that Kindred was required to administer "appropriate" antibiotics as ordered by the physician, "monitor the infection," and "determine if the treatment plan was successfully treating the infection." However, "[a] 'fair summary' of the standard of care is 'something less than a full statement of the applicable standard of care and how it was breached.'" *Fagadau v. Wenkstern*, 311 S.W.3d 132, 138 (Tex. App.—Dallas 2010, no pet.) (quoting *Palacios*, 46 S.W.3d at 880); *see also Certified EMS*, 392 S.W.3d at 630 ("A report need not cover every alleged liability theory to make the defendant aware of the conduct that is at issue."). Though lacking in painstaking details, the Kindred Report has sufficiently notified Kindred of the applicable standard of care and the conduct at issue—Kindred failed to assess Young's condition, administer appropriate antibiotics, monitor the infection, determine if its treatment plan was succeeding and alter it if necessary, and properly document and notify the attending physician of changes in Young's condition that would require additional diagnostic testing and orders. As to identifying the standard of care and the conduct at issue, the Kindred Report need not do more.

Therefore, we hold that the Kindred Report satisfied the requirement that it identify the applicable standards of care and conduct for which they seek to hold Kindred liable. *See Gonzalez*, 485 S.W.3d at 250 (affirming denial of motion to dismiss HCLC because "this case involves the treatment of infection and wounds, which are subjects common to all areas of medicine, and it involves an alleged complete failure to

13

coordinate a treatment plan between doctors," "the level of technical detail needed to . . . determine if a case is frivolous is less than that needed to determine if a suit involving a highly complex procedure like a surgery is frivolous").

Regarding breach, the Kindred Report avers that Kindred failed to write new orders, failed to order antibiotics, failed to attempt to notify the attending physician that Young needed a skin and scrotal assessment, and failed to make further orders and diagnostic testing when Young's condition had worsened. We hold that this provided Kindred with a fair summary of how Kindred breached the standards of care. *See Gonzalez*, 485 S.W.3d at 252 (affirming denial of HCLC motion to dismiss for duty and breach elements of wound-care case when expert alleged that defendant doctor failed to create and enforce an adequate follow-up plan); *Trisun Healthcare, LLC v. Lopez*, No. 13-13-00238-CV, 2014 WL 3050350, at *3 (Tex. App.—Corpus Christi July 3, 2014, no pet.) (mem. op.) (affirming trial court's denial of HCLC motion to dismiss when expert report stated that medical facility "fail[ed] to immediately notify the deceased's physician of the deterioration of the wound on his hand and fail[ed] to recognize and treat the deteriorating wound on the deceased's hand [which] caused the infection to progress and worsen").

### 2. Causation

"To satisfy the required element of causation under chapter 74, an expert report must include a fair summary of the expert's opinion regarding the causal relationship between the breach of the standard of care and the injury, harm, or damages claimed."

14

*Whisenant v. Arnett*, 339 S.W.3d 920, 923 (Tex. App.—Dallas 2011, no pet.). To provide fair notice of causation, "[a]n expert is required to link his or her conclusions to the facts, but no 'magical words' are required." *SCC Partners, Inc v. Ince*, 496 S.W.3d 111, 118 (Tex. App.—Fort Worth 2016, pet. dism'd).

The Kindred Report asserted that

[a]s a direct result of Kindred's breaches of the above standards of care, Mr. Young developed an infection prior to his myocardial infarction on April 10, 2015. Specifically, the nurses' failure to properly treat his abscessed wound, which did not heal, thus allowing a mode of transmission for the bacteria to proliferate and spread the infection in Mr. Young's body. His endocarditis was caused by sepsis. The onset of sepsis occurs only after an infection. Between January 29, 2015 and April 10, 2015, Mr. Young developed a serious infection that showed symptoms of infection by delivering pus from his scrotum which had created an abscess. This is further confirmed by blood cultures that confirmed Mr. Young had Enterococcus faecalis bacteria, which are found in wound infections and is a cause of endocarditis.

Had Kindred properly monitored and assessed Mr. Young during this period of time, clinical findings would have indicated signs and symptoms of an ongoing infection process. Specifically, had the nurses informed Mr. Young's attending physician of the changes to his condition, and his abnormal lab results in a timely manner, this would have provided a window of opportunity in which assessment and treatment could have, and based on reasonable medical probability would have, been implemented before sepsis developed. Thus, had Kindred properly evaluated, assessed, and monitored Mr. Young from January 29, 2015 through April 10, 2015, Mr. Young would have received treatment for his infection. Unfortunately, these opportunities were missed due to Kindred's failure to ensure he was timely assessed and treated. As a direct result of not identifying and receiving timely treatment for his infection, Mr. Young developed bacterial endocarditis as a result of infection in his blood (sepsis), had an acute myocardial infarction and cardiogenic shock resulting in his untimely death on April 16, 2015.

Similar to Kindred's assertions regarding the standard of care and breach, its assertions concerning causation center on Kindred's belief that Dr. Eskildsen's statements are "contradicted by the facts and Dr. Eskildsen's own report" as to Dr. Siddiqi. And just as we explained in those instances, it is not proper for the trial court or a reviewing court to act as a factfinder by going outside of the four corners of the expert report.

The allegations within the four corners of the Kindred Report provided fair notice to Kindred of the Jacksons' allegations that Kindred's staff's failure to assess, monitor, and treat Young's infection and failure to notify the attending physician of Young's changed condition and abnormal lab results, caused sepsis, leading to endocarditis, an acute myocardial infarction and cardiogenic shock, and Young's death. Accordingly, we hold that the Kindred Report satisfied section 74.351's requirement of providing Kindred with fair notice of its specific breaches of the applicable standards of care and how those breaches were linked to Young's injuries and death. *Allen*, 387 S.W.3d at 923 (rejecting appellants' contention that the expert's "opinion on causation is insufficient because it conflicts with matters contained in other expert reports and the facts in the case" because "[t]he inquiry at the report stage focuses on whether the information within the four corners of the report meets the good faith requirement of the statute" and "[i]f the facts do not support a plaintiff's claim, summary judgment procedures provide a remedy").

Thus, in limiting our review to the allegations in the four corners of the Kindred Report, we hold that the report satisfied the fair-notice requirements of section 74.351 and that the trial court abused its discretion by sustaining Kindred's objection. We sustain the Jacksons' first issue.[5]

## V. Conclusion

Having held that the trial court abused its discretion by sustaining Kindred's objections to the Jacksons' expert report and dismissing their claims, we reverse the trial court's judgment and remand for further consistent proceedings. *See* Tex. R. App. P. 43.2(d), 43.3.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: November 1, 2018

---

[5]Because we sustain the Jacksons' first issue, we need not address their second issue concerning their motion to reconsider. *See* Tex. R. App. P. 47.1.

17