

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00179-CV

_____

TAMMY ROE, AS THE EXECUTRIX OF THE ESTATE OF MICHAEL KEVIN
ROE, Appellant

V.

EL-CID ORGANO TAJON, M.D. AND TEXAS HEALTH HARRIS METHODIST
HOSPITAL, Appellees

On Appeal from the 67th District Court
Tarrant County, Texas
Trial Court No. 067-337383-22

Before Sudderth, C.J.; Kerr and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

After Decedent Michael Kevin Roe's death, the executrix of his estate, Appellant Tammy Roe (the Estate), filed health care liability claims against Appellees Dr. El-Cid Organo Tajon and Texas Health Harris Methodist Hospital (the Hospital). The Estate served several expert reports pursuant to the Medical Liability Act, but the trial court found the relevant report[1] to be inadequate, so it dismissed the Estate's claims against Dr. Tajon and the Hospital. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 51.014(a)(10), 74.351(b), (*l*). Because the expert report is adequate, we will reverse and remand.

## I. Background

Decedent was treated at the Hospital for a heart attack on March 2, 2021, and after undergoing surgery, he had a stroke, which led to another surgery. Following these operations, Decedent received preventative treatments for multiple medical concerns, one of which was venous thrombosis (i.e., development of a blood clot), including deep venous thrombosis (DVT) and a pulmonary embolism.[2] He was

---

[1]The Estate served reports from multiple experts, but only one of those experts addressed Dr. Tajon's and the Hospital's alleged breaches. That expert authored three expert reports—an original report, an amended report, and a second amended report—but the final amended report superseded the prior two versions and was the relevant document before the trial court when it ruled on the motions to dismiss.

[2]Although the Estate's expert reports do not define these terms, Merriam-Webster's Medical Dictionary does. It defines:

2

treated with "compression devices for DVT prophylaxis[] and DVT chemoprophylaxis (enoxaparin[3] 40 mg subcutaneous)." After his condition began to improve, on March 5, he was transferred out of the intensive care unit and into the progressive care unit, where he was under the care of Dr. Tajon.

During Decedent's four days in Dr. Tajon's care, he was "maintained on both mechanical and chemical DVT prophylaxis daily." Then, Dr. Tajon discharged

---

- "thrombosis" as "the formation or presence of a blood clot within a blood vessel," *Thrombosis*, Merriam-Webster, https://www.merriam-webster.com/dictionary/thrombosis#medicalDictionary (last visited Dec. 8, 2023); *see Thrombosis*, Webster's Third New International Dictionary 2384 (reprt. 2021) (1961) (same);
- "deep vein thrombosis" as "a condition marked by the formation of a thrombus within a deep vein (as of the leg or pelvis) . . . that is potentially life threatening if dislodgment of the thrombus results in pulmonary embolism," *Deep Vein Thrombosis*, Merriam-Webster, https://www.merriam-webster.com/medical/deep%20vein%20thrombosis (last visited Dec. 8, 2023); and
- "pulmonary embolism" as an "obstruction of a pulmonary artery or one of its branches that is usually produced by a blood clot which has originated in a vein of the leg or pelvis and traveled to the lungs and that is marked by labored breathing, chest pain, fainting, rapid heart rate, cyanosis, shock, and sometimes death," *Pulmonary Embolism*, Merriam-Webster, https://www.merriam-webster.com/medical/pulmonary%20embolism (last visited Dec. 8, 2023); *see Embolism*, Webster's Third New International Dictionary 740 (reprt. 2021) (1961) (defining "embolism" as "the sudden obstruction of a blood vessel by an embolus").

[3]"Enoxaparin" is "a fragment of heparin of low molecular weight that is administered by subcutaneous injection in the form of its sodium salt[,] especially to prevent and treat deep vein thrombosis and pulmonary embolism following surgery." *Enoxaparin*, Merriam-Webster, https://www.merriam-webster.com/medical/enoxaparin (last visited Dec. 8, 2023).

Decedent to a rehabilitation facility. In Decedent's discharge documentation, Dr. Tajon noted that DVT prophylaxis was addressed during Decedent's stay, but the discharge medication reconciliation[4] did not list enoxaparin or any other DVT prophylaxis among the treatments to be administered after discharge.

At the rehabilitation facility, Decedent's physician—Dr. William Bridges—noted the need for DVT prophylaxis and listed DVT and pulmonary embolism among Decedent's potential risk factors and complications. But he did not administer enoxaparin or any other preventative DVT treatments. And when a cardiologist and a cardiology physician's assistant reviewed Decedent's case a few days later, neither health care provider administered enoxaparin or any other DVT treatment.

After a few days at the rehabilitation facility, Decedent began experiencing chest pain and shortness of breath. When these symptoms continued, Dr. Bridges ordered several tests, including a CT scan of Decedent's chest. The radiologist who interpreted this CT scan—Dr. Jason Pond—identified a "[l]arge saddle embolus[5] in[]

---

[4]At one of the hearings on the health care providers' expert-report objections, the Hospital's counsel explained that "[t]he reconciliation report . . . is basically orders going forward[;] it's what the orders are to the next facility will be [sic] for this particular patient when they get there." The Estate's counsel did not dispute this summary.

[5]A "saddle embolus" is "an embolus that straddles the branching of an artery blocking both branches." *Saddle Embolus*, Merriam-Webster, https://www.merriam-webster.com/medical/saddle%20embolus (last visited Dec. 8, 2023); *see Saddle Embolus*, Webster's Third New International Dictionary 1997 (reprt. 2021) (1961) (same).

4

the . . . pulmonary arteries" and "[m]oderate thrombus in the right atrium." How and when Dr. Pond communicated these results to the rehabilitation facility is disputed, but regardless, the next morning, a cardiology physician's assistant reviewed the CT scan results and initiated Decedent's transfer to the emergency room.

From there, Decedent's condition rapidly deteriorated. His blood pressure began decreasing, and just as his health care providers were about to begin a "mechanical thrombectomy,"[6] Decedent turned blue and had to be intubated. He died later that day from a "sub-massive pulmonary embolus."

The Estate sued many of the health care providers involved in this chain of events, but Dr. Tajon and the Hospital are the only two providers relevant to this appeal.[7] The Estate alleged that Dr. Tajon negligently failed to require enoxaparin or any other prophylactic DVT treatments as part of Decedent's discharge medication reconciliation and that the Hospital negligently failed to implement or follow procedures for accurate medication reconciliation upon discharge.

---

[6]A "thrombectomy" is a "surgical excision of a thrombus," which is "a clot of blood formed within a blood vessel." *Thrombectomy*, Merriam-Webster, https://www.merriam-webster.com/medical/thrombectomy (last visited Dec. 8, 2023); *Thrombus*, Merriam-Webster, https://www.merriam-webster.com/dictionary/thrombus#medicalDictionary (last visited Dec. 8, 2023); *see Thrombus*, Webster's Third New International Dictionary 2384 (reprt. 2021) (1961).

[7]*See Roe v. Tajon*, No. 02-23-00179-CV, 2023 WL 6152621, at *1 (Tex. App.—Fort Worth Sept. 21, 2023, no pet. h.) (per curiam) (mem. op.) (granting voluntary motion to dismiss filed by two other health care providers).

5

The Estate served three expert reports, one of which addressed Dr. Tajon's and the Hospital's alleged breaches.[8] In that report, Dr. Aaron Gottesman opined that Dr. Tajon's "fail[ure] to list enoxaparin or any other DVT prophylaxis as a medication to be administered in [Decedent's] discharge medication reconciliation" fell below the standard of care, and that as a result, "Dr. Tajon contributed to [Decedent] not receiving DVT chemoprophylaxis in [the rehabilitation facility] . . . and contributed to [Decedent's] development of a popliteal[9] [DVT] and sub-massive saddle pulmonary embolus," making Decedent's death a foreseeable outcome. Dr. Gottesman further opined that the Hospital had an independent, organizational duty "to develop, implement[,] and enforce clear policies for medication reconciliation" and that it was "clear from the omission of enoxaparin or other DVT prophylaxis . . . that discharge medication reconciliation procedures were either not in place or were not followed by the medical or nursing staff at [the Hospital]." He stated that the Hospital's failure to implement or follow such procedures "increased the likelihood of [Decedent] not receiving DVT chemoprophylaxis [in the rehabilitation facility] . . . and contributed to

---

[8]In the other two expert reports, Dr. Seth Glick—a radiologist—opined regarding Dr. Pond's alleged breach of the standard of care, and Dr. Brian Swirsky—a cardiologist—opined regarding the alleged breaches by Decedent's cardiologist and cardiology physician's assistant.

[9]"Popliteal" is defined as "of or relating to the back part of the leg behind the knee joint." *Popliteal*, Merriam-Webster, https://www.merriam-webster.com/dictionary/popliteal#medicalDictionary (last visited Dec. 8, 2023); *see Popliteal*, Webster's Third New International Dictionary 1765 (reprt. 2021) (1961) (same).

[his] development of a popliteal [DVT] and sub-massive saddle pulmonary embolus," making Decedent's death a foreseeable outcome.

Dr. Tajon and the Hospital filed separate objections to Dr. Gottesman's report, and after the Estate filed amended reports,[10] Dr. Tajon and the Hospital each objected again. Dr. Tajon argued that the final report did not adequately address causation, while the Hospital argued that the report did not adequately identify the standard of care that it had allegedly breached.[11] The trial court sustained the objections and dismissed the Estate's claims against both health care providers.

---

[10]Following Dr. Tajon's and the Hospital's initial objections to Dr. Gottesman's report, the Estate served an amended report from Dr. Gottesman along with the two other expert reports that addressed other health care providers' actions. Then, later, the trial court signed orders authorizing the Estate to file additional amended expert reports. But because Dr. Gottesman's original expert reports had been filed so early in the litigation, the trial court's deadline for the amendment came before the Estate's statutory 120-day deadline for serving Dr. Tajon and the Hospital with initial expert reports. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). Regardless, the Estate timely filed amended reports, and Dr. Tajon and the Hospital objected again.

[11]After the Estate responded to the renewed objections, the Hospital filed a reply that attempted to assert a new challenge to the causation component of Dr. Gottesman's report. But this new objection was served after "the 21st day after the date the report [wa]s served," so it was untimely. *Id.*; *Williams v. Mora*, 264 S.W.3d 888, 890–91 (Tex. App.—Waco 2008, no pet.) (holding that provider waived untimely objections to expert report).

7

## II. Governing Law and Standard of Review

Under the Medical Liability Act, a plaintiff asserting a health care liability claim[12] must serve each health care provider with a timely, adequate expert report relatively early in the litigation. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a); *Baty v. Futrell*, 543 S.W.3d 689, 692–93 (Tex. 2018); *Nazarian v. Remarkable Healthcare of Carrollton, LP*, No. 02-22-00324-CV, 2023 WL 3370721, at *2 (Tex. App.—Fort Worth May 11, 2023, no pet.) (mem. op.). If the expert report is untimely or inadequate,[13] then upon the health care provider's motion, the trial court must dismiss the health care liability claims against that provider. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(b), (*l*); *see Baty*, 543 S.W.3d at 692–93.

An expert report is inadequate if "it appears to the [trial] court, after hearing, that the report does not represent an objective good faith effort to comply with the [statutory] definition of an expert report," i.e., to provide "a fair summary of the expert's opinions . . . regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages

---

[12]The parties do not dispute that the Estate's claims are health care liability claims. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.001(a)(13) (defining "[h]ealth care liability claim").

[13]If the report is inadequate but the deficiencies are curable, the trial court "may grant one 30-day extension to the claimant in order to cure the deficiency." *Id.* § 74.351(c).

claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6); *Baty*, 543 S.W.3d at 693.

This is a "lenient standard." *Scoresby v. Santillan*, 346 S.W.3d 546, 549 (Tex. 2011). The purpose of the expert report "is to 'inform the defendant of the specific conduct the plaintiff has called into question,' and to 'provide a basis for the trial court to conclude that the claims have merit.'" *Jackson v. Kindred Hosps. Ltd. P'ship*, 565 S.W.3d 75, 80 (Tex. App.—Fort Worth 2018, pet. denied) (quoting *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 879 (Tex. 2001)); *see Nazarian*, 2023 WL 3370721, at *2 (similar). The report need not marshal all of the plaintiff's proof, nor rise to the level of summary judgment evidence, nor convince the reader that the expert's conclusions are reasonable. *Abshire v. Christus Health Se. Tex.*, 563 S.W.3d 219, 223, 226 (Tex. 2018); *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 516–17 (Tex. 2017); *Nazarian*, 2023 WL 3370721, at *2. "[A] trial court's job is to be a gatekeeper—not to determine the truth or falsity of an expert's opinion." *Jackson*, 565 S.W.3d at 81.

A trial court's decision to dismiss a claim based on an inadequate expert report is reviewed for an abuse of discretion. *Baty*, 543 S.W.3d at 693; *Rosemond v. Al-Lahiq*, 331 S.W.3d 764, 766 (Tex. 2011); *Nazarian*, 2023 WL 3370721, at *3. We will affirm the trial court's decision on any preserved, meritorious legal theory supported by the record. *See Rosemond*, 331 S.W.3d at 766.

## III. Discussion

The Estate argues that the trial court abused its discretion by (1) dismissing its claims against Dr. Tajon based on Dr. Tajon's objection to the causation portion of Dr. Gottesman's expert report; and (2) dismissing its claims against the Hospital based on the Hospital's objection to the standard of care portion of Dr. Gottesman's report.[14]

### A. The report causally connects Dr. Tajon's breach to Decedent's death.

In Dr. Tajon's objection to Dr. Gottesman's final report, he argued that the report did not sufficiently explain the causal link between his alleged breach and Decedent's development of DVT or a pulmonary embolus. He reiterates this argument on appeal, claiming that Dr. Gottesman's attempt to link Dr. Tajon's actions to Decedent's death is "not factually tenable given Dr. Bridges' documented knowledge of [Decedent's] need for DVT prophylaxis and risk of pulmonary embolism at the time of his admission." According to Dr. Tajon, his actions were too attenuated from Decedent's death to have caused it.

But whether Dr. Gottesman's opinion is factually tenable is not for the trial court to resolve at this stage. The Estate was permitted to plead multiple theories of liability "regardless of consistency." Tex. R. Civ. P. 48. The trial court was not tasked

---

[14]The Estate raises another issue related to the trial court's discretion to grant it an extension to cure any deficiencies in Dr. Gottesman's final expert report, but this issue is mooted by our conclusion that the report is adequate. *See* Tex. R. App. P. 47.1.

with fact-checking the expert report, nor was it tasked with determining which of the Estate's various theories of liability—theories that may or may not be borne out in discovery—shows the most promise. *See Jackson*, 565 S.W.3d at 86 (rejecting argument that expert's causation opinion was undermined by his own statements in second report addressing alternative theory of liability; reiterating that "it is not proper for the trial court or a reviewing court to act as a factfinder"); *Christus Santa Rosa Health Sys. v. Baird*, No. 03-14-00521-CV, 2016 WL 462759, at *4–6 (Tex. App.—Austin Feb. 4, 2016, no pet.) (mem. op.) (rejecting challenge to expert report based on its alleged contradiction with second expert report that addressed alternative theory of liability); *Christus Spohn Health Sys. Corp. v. Lopez*, No. 13-13-00165-CV, 2014 WL 3542094, at *6–7 (Tex. App.—Corpus Christi–Edinburg July 17, 2014, no pet.) (mem. op.) (similar); *cf. Certified EMS, Inc. v. Potts*, 392 S.W.3d 625, 632 (Tex. 2013) (noting that "[d]iscovery allows a claimant to refine her pleadings to abandon untenable theories and pursue supported ones," and while "a full development of all liability theories may be required for pretrial motions or to convince a judge or jury during trial, there is no such requirement at the expert[-]report stage").

Rather, "with respect to causation, the [trial] court's role is to determine whether the expert has explained how the negligent conduct caused the injury[; w]hether this explanation is believable should be litigated at a later stage of the proceedings." *Abshire*, 563 S.W.3d at 226. Dr. Gottesman's report explains the chain of events that—in his opinion—began with Dr. Tajon's allegedly negligent failure to

11

require post-discharge DVT prophylaxis and ended with Decedent developing DVT and dying from a pulmonary embolus. *See Denduluri v. Bravo*, No. 01-22-00230-CV, 2023 WL 4003520, at \*5 (Tex. App.—Houston [1st Dist.] June 15, 2023, no pet.) (mem. op.) ("An expert may show causation by explaining a chain of events that begins with the defendant physician's negligence and ends in injury to the plaintiff."); *Fernandez v. Gonzales*, No. 03-21-00586-CV, 2022 WL 3691679, at \*6 (Tex. App.—Austin Aug. 26, 2022, pet. denied) (mem. op.) (similar); *Keepers v. Smith*, No. 01-20-00463-CV, 2022 WL 2347744, at \*16 (Tex. App.—Houston [1st Dist.] June 30, 2022, pet. denied) (mem. op.) (similar). He opines that "DVT prophylaxis was a required medication to prevent [Decedent] from forming DVTs post discharge" and that "[a]s a result of omitting enoxaparin on the discharge document from the list of medications to continue, Dr. Tajon contributed to [Decedent] not receiving DVT chemoprophylaxis in [the rehabilitation facility], . . . and contributed to [Decedent's] development of a popliteal [DVT] and sub-massive saddle pulmonary embolus." He further states that Decedent's "death from a sub-massive pulmonary embolus was a foreseeable outcome of Dr. Tajon's breach." While Dr. Tajon may disagree with the factual basis for this opinion, such disagreement is not for the trial court to resolve at this preliminary stage.

The same is true of Dr. Tajon's argument that his actions were too attenuated from Decedent's injuries. Although a negligent act can indeed be "too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about

12

the harm,"[15] *Rodriguez-Escobar*, 392 S.W.3d at 113 (quoting *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 329 (Tex. 2008)), at this stage, the plaintiff's burden "is not to prove a causal link by a preponderance of the evidence to the satisfaction of a factfinder or to rule out all other possible causes of injury," *Woodland Nursing Operations, LLC v. Vaughn*, No. 02-22-00169-CV, 2022 WL 17494603, at *14 (Tex. App.—Fort Worth Dec. 8, 2022, pet. denied) (mem. op.) (quoting *Pinnacle Health Facilities XV, LP v. Chase*, No. 01-18-00979-CV, 2020 WL 3821077, at *12 (Tex. App.—Houston [1st Dist.] July 7, 2020, no pet.) (mem. op.)); *see Davis v. Swaim*, No. 01-21-00596-CV, 2022 WL 2812064, at *8 (Tex. App.—Houston [1st Dist.] July 19, 2022, no pet.) (mem. op.) (recognizing that "[a]n expert report 'need not anticipate or rebut all possible defensive theories that may ultimately be presented'" (quoting *Owens v. Handyside*, 478 S.W.3d 172, 187 (Tex. App.—Houston [1st Dist.] 2015, pet. denied) (op. on reh'g))). Dr. Gottesman's report not only explains the chain of events that allegedly linked Dr. Tajon's actions to Decedent's death but also states that "Dr. Tajon's breach of the standard of care was a substantial factor in the death of [Decedent]," clarifying that Dr. Gottesman does not consider Dr. Tajon's breach to be "too attenuated from [Decedent's] resulting injuries." *See Rodriguez-Escobar*, 392

---

[15]Generally, an expert report's discussion of causation must explain how the plaintiff will prove both foreseeability and cause-in-fact, and "[f]or a negligent act or omission to have been a cause-in-fact of the harm, [it] must have been a substantial factor in bringing about the harm." *Columbia Valley Healthcare Sys., L.P. v. Zamarripa*, 526 S.W.3d 453, 460 (Tex. 2017) (quoting *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013)).

S.W.3d at 113 (quoting *Providence Health Ctr.*, 262 S.W.3d at 329). At a later stage, the factfinder can resolve the parties' factual disputes regarding what did or did not cause Decedent's death and whether intervening factors attenuated the link between Dr. Tajon's actions and Decedent's sub-massive pulmonary embolus. *Cf. Benish v. Grottie*, 281 S.W.3d 184, 204 n.12 (Tex. App.—Fort Worth 2009, pet. denied) (rejecting defendants' challenge to expert causation opinions when defendants claimed that "intervening act after discharge" could have caused the death and stating that "[w]hether [the provider is] entitled to a new and independent cause inferential rebuttal instruction will be determined by evidence introduced at trial"). For now, though, Dr. Gottesman's report is sufficient to "'inform the defendant of the specific conduct the plaintiff has called into question,' and to 'provide a basis for the trial court to conclude that the claims have merit.'" *Jackson*, 565 S.W.3d at 80 (quoting *Palacios*, 46 S.W.3d at 879).

Because Dr. Gottesman's expert report adequately informs Dr. Tajon of how his actions allegedly caused Decedent's injury, it "represent[s] an objective good faith effort" to provide "a fair summary of . . . the causal relationship between [Dr. Tajon's] failure and the injury, harm, or damages claimed."[16] Tex. Civ. Prac. & Rem. Code

---

[16]Dr. Tajon also notes Dr. Gottesman's use of the phrases "increased the likelihood" and "contributed to" rather than "caused." To the extent that Dr. Tajon intends to argue that such phrases are insufficient to explain causation, we disagree. "[A] report's adequacy does not depend on whether the expert uses any particular 'magical words.'" *Columbia Valley Healthcare Sys.*, 526 S.W.3d at 460 (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 53 (Tex. 2002)); *see Bowie Mem'l Hosp.*, 79 S.W.3d

14

Ann. § 74.351(*l*), (r)(6); *see Jackson*, 565 S.W.3d at 80; *Baty*, 543 S.W.3d at 693–94. Therefore, the trial court abused its discretion by sustaining Dr. Tajon's causation-related objection to the report and by dismissing the health care liability claims asserted against him.

## B. The report identifies the Hospital's allegedly breached standard of care.

As for the Hospital, it objected to Dr. Gottesman's expert report by arguing that the report failed to specify the relevant standard of care that the Hospital had breached.[17]   But the substance of the Hospital's argument was not that Dr.

---

at 53 (agreeing with court of appeals that "magical words" do not determine expert report's adequacy when report used the word "possibility" rather than "reasonable medical probability"); *Davis*, 2022 WL 2812064, at *8 (concluding that "[a]lthough [the expert report] did not expressly use the term 'causation,' such 'magic words' are not required"). In *Miller*, the Texas Supreme Court rejected a challenge to an expert report based on the expert's use of the word "can," and it cautioned that the report must be read as a whole. 536 S.W.3d at 515 (discussing expert report that opined that certain actions "'can' lead to aspiration, which 'can' be deadly"); *see Williams*, 264 S.W.3d at 892 (holding expert report sufficient despite use of "could have" because other portions of the report "provide[d] unequivocal, non-speculative, statements relating to causation"). Here, Dr. Gottesman's report identifies Dr. Tajon's breach as "a substantial factor in the death of [Decedent]," and it states that "Decedent's death . . . was a foreseeable outcome of Dr. Tajon's breach." Reading Dr. Gottesman's report as a whole, his opinion is clear that Dr. Tajon's actions caused Decedent's sub-massive pulmonary embolus. His use of the phrases "increased the likelihood" and "contributed to" do not render his report inadequate.

[17]The Hospital has not briefed the standard-of-care objection that it raised in the trial court. Instead, it filed a joint appellate brief with Dr. Tajon, and the joint brief focuses on the causation component of the relevant expert report—even though the Hospital did not timely raise this issue before the trial court. *See supra* note 11; *see also* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a) (establishing deadline for objections to expert report). Nonetheless, because we must affirm the trial court's

Gottesman had failed to identify the breached standard of care; rather, the Hospital disputed whether the standard of care identified by Dr. Gottesman actually existed.

Dr. Gottesman's report describes the Hospital's "organizational responsibility to ensure [that] accurate medication reconciliation occurs" and "to develop, implement[,] and enforce clear policies for medication reconciliation." He states that it was "clear from the omission of enoxaparin or other DVT prophylaxis . . . that discharge medication reconciliation procedures were either not in place or were not followed by the medical or nursing staff at [the Hospital]"[18] and that this lapse caused Decedent's death.

The Hospital argued, though, that because Dr. Gottesman blamed Dr. Tajon for failing to reconcile Decedent's medications at the time of discharge, and because Dr. Tajon was not a Hospital employee, the Hospital could not be held responsible for Dr. Tajon's mistake. The Hospital's counsel told the trial court that "it's essentially a standard of care question[:] . . . [s]hould this medication [i.e., DVT prophylaxis] have been put on the list, period . . . and that's not a hospital question."

judgment if there is any meritorious legal theory supported by the record, we consider the Hospital's unbriefed standard-of-care objection. *See Rosemond*, 331 S.W.3d at 766.

[18]In the Hospital's objection to Dr. Gottesman's final expert report, it argued that this inference was unreasonable. But "the testing of whether [the expert's] opinions are reasonable is for another day." *Woodland Nursing Operations*, 2022 WL 17494603, at *9 (noting that expert "was allowed to draw the inferences from the records that he reviewed, and even if those inferences appear flawed, a motion challenging the adequacy of the report is not the proper vehicle to test the reasonableness of the inferences").

But this argument "puts the cart before the horse." *Nazarian*, 2023 WL 3370721, at *3 n.6 (rejecting argument that expert report was insufficient based on disagreement that duty existed). "At this preliminary stage, whether [Dr. Gottesman's proposed] standards [of care] appear reasonable is not relevant to the analysis of whether the expert's opinion constitutes a good-faith effort." *Miller*, 536 S.W.3d at 516–17; *see Keepers*, 2022 WL 2347744, at *13 (rejecting challenge to expert report and reiterating that "[w]hether [the expert's] opinions that the same or similar standard of care applies to [the two physicians] . . . are correct is not the question at this stage in the litigation"). While the Hospital may disagree that both it and Dr. Tajon had independent duties to ensure that accurate medication reconciliation occurred, Dr. Gottesman opined that such independent duties existed, and that is sufficient for purposes of the expert-report requirement. *See Miller*, 536 S.W.3d at 516–17.

Thus, Dr. Gottesman's expert report adequately "inform[s the Hospital] of the specific conduct the [Estate] has called into question," *Jackson*, 565 S.W.3d at 80 (quoting *Palacios*, 46 S.W.3d at 879), and it "represent[s] an objective good faith effort" to provide "a fair summary of the expert's opinions . . . regarding applicable standards of care[ and] the manner in which the care rendered by the physician or health care provider failed to meet the standards." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*), (r)(6); *see Baty*, 543 S.W.3d at 693–94. The trial court erred by sustaining the Hospital's objection to the report and by dismissing the health care liability claims against it.

## III. Conclusion

The trial court erred by sustaining Dr. Tajon's and the Hospital's objections to Dr. Gottesman's report. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351. We reverse the trial court's orders dismissing the health care liability claims against these two health care providers, and we remand the case for further proceedings consistent with this opinion. *See* Tex. R. App. P. 43.2(d).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered: December 14, 2023